Argued October 26; affirmed December 13, 1949; petition for
rehearing denied January 24, 1950

# ROSE ET UX. *v.* DENN ET UX.

### 212 P. (2d) 1077
### 213 P. (2d) 810

[ 1 ]

*Avery W. Thompson* and *William D. Green, Jr.,* of Roseburg, argued the cause and filed a brief for appellants.

*Carl M. Felker,* of Roseburg, argued the cause for respondents. With him on the brief was Paul E. Geddes, of Roseburg.

Before LUSK, Chief Justice, and BRAND, ROSSMAN, BAILEY, HAY and PAGE, Justices.

ROSSMAN, J.

This is an appeal by the defendants from a decree of the Circuit Court which held that the plaintiffs "are the owners and users of an easement and way of necessity, more particularly described as follows, * * *. The defendants and each of them be and they hereby are perpetually restrained and enjoined from in any manner closing or interfering with the use and travel of said easement and way of necessity by the plaintiffs * * *." The easement and way of necessity sustained by the challenged decree extends across a tract of land which is owned by the defendants-appellants, Henry Denn and Nora Denn, husband and wife. The other defendants-appellants have an interest in the Denns' property, but the interest is immaterial to the issues in this case. Our use of the term "the appellants" will hereafter mean the defendants-appellants, Henry Denn and Nora Denn. All of the lands involved in this suit are situated in Sections 25, 26 and 35, Township 29 South, Range 9 West, Willamette Meridian, and are near Camas Valley in Douglas County.

A glance at the following sketch, which makes no pretense at accuracy, will facilitate an understanding of the facts which we shall presently narrate.

The ownership by the respondents, who are husband and wife, of the Northeast quarter of the Northwest quarter of Section 35, being the 40-acre tract which our sketch shows, is conceded. The respondents were the plaintiffs in the Circuit Court. Likewise conceded is the fact that the appellants own the tracts attributed to them by our sketch. Their lands are:

"The West half of the Southwest quarter (W ½ SW ¼) and the Southeast quarter of the Southwest quarter (SE ¼ SW ¼), Section 25.

"Lot No. Four (4) and the Southwest quarter of the Southwest quarter (SW ¼ SW ¼) Section 26.

"A strip of land 120 feet wide off the North end of Lot No. Four (4) and a strip of land 120 feet wide off the North end of the Southwest quarter of the Southeast quarter (SW ¼ SE ¼) Section 25.

"All that part of the Adam Day Donation Claim No. 44 in Section 26, described as follows, to-wit: Beginning at the Southeast corner of said Section 26, running thence North 40 chains; thence West 56.50 chains to the Northeast corner of Lot No. 4 in said Section 26; thence South 40 chains to the Southwest corner of said Donation Claim No. 44; thence East 56.36 chains to the place of beginning.

"All of the above land being in Township 29 South of Range 9 West of the Willamette Meridian, and containing in the aggregate 396.82 acres more or less."

From the appellant's brief, we quote the following:

"It is undisputed that at present a roadway is in existence over and across the appellant's property including the property acquired by Henry J. Denn from Jacob Denn, the ancestor, in 1894 and that this roadway extends in an easterly and northerly direction commencing about 50 feet west of the northeast corner of the respondents' property."

The quoted language mentions a conveyance made by Jacob Denn to Henry J. Denn in 1894. The conveyee, Henry J. Denn, was the son of the conveyor and father of the appellant, Henry Denn. It is the contention of the respondents that since the conveyed tract lay between the public road and other tracts which the conveyor owned, an implication arose that the conveyor reserved an easement or way of necessity across the conveyed lands. The thoroughfare shown on our sketch and marked ''public road'' is a county road which was opened in 1874. Thus, the easement, recognized by the decree, is not imposed upon the retained land, but upon the conveyed property. The quoted statement speaks of the ''present'' existence of the road which it mentions, but the appellant, Henry Denn, as a witness, conceded that the road was in use as long ago as 1914. That road is the ''easement and way of necessity'' claimed by the respondents and mentioned in the part of the decree which we quoted. We made no effort to trace it upon our map. Hereafter when we employ the term, ''the road'', we will mean the purported ''easement and way of necessity''; that is, the road described in the sentence which we just took from the appellants' brief. It will be observed from the statement which we quoted that the road terminates at its western extremity in the respondents' 40-acre tract of land. Its eastern end leads into the county road which shortly, in its southerly course, joins the Coos Bay Highway. The road (easement) is the same one which was the subject matter of *Baum v. Denn,* decided by us November 15, 1949.

The respondents' tract contains a stand of timber and is unimproved. The appellants' land is improved with a dwelling house and farm structures.

The complaint alleges:

"That the lands of the plaintiffs and the defendants, as hereinabove described, were derainged by separate chains of title from a common grantor, Jacob Denn, who owned all of said lands on or about the year 1894. That at the time said lands were owned by Jacob Denn there was a county road running along the east boundary of the lands now owned by the defendants and then owned by Jacob Denn, and that said county road has ever since that time and now is used by the general public as a public highway. That there was not at the time the property was conveyed to the plaintiffs' predecessors in interest nor is there now any public road which can be used as ingress to and or egress from the hereinabove described lands of the plaintiffs. That it is necessary that the plaintiffs have ingress to and egress from their lands."

That averment is denied by the answer, but the part concerning deraignment of title from a common source was conceded, as well as established, by evidence at the trial. The complaint alleges that January 10, 1945, the appellants erected a barrier across the road and denied the respondents the privilege of using it any further.

The respondents' brief claims that they obtained their right to the use of the road in the following ways: (1) "By implied right or grant"; (2) "right to travel the same by reason of the way of necessity"; (3) "if, as the appellants contend, there is no implied right, then the respondents and their predecessors have acquired their rights to the same by adverse use, as shown by the testimony of both appellants and respondents as to the many years that the roadway was in use and travel." The appellants present the following contentions: (1) "The record does not show evidence

that the respondents acquired the described easement by prescription"; (2) "the doctrine of implied easement does not apply"; and (3) "the doctrine of a way of necessity does not apply."

Although the parties express their contentions in the words just quoted, the issues to which they devoted their major efforts during the trial were these: (1) Does any public road lead to the tract owned by the respondents? and (2) was it necessary for the respondents to travel upon the appellants' land in order to reach a public thoroughfare? During the trial the respondents contended that no public road reached their property and that the appellants' land lay between respondents' and the public thoroughfare. The appellants controverted those propositions. During the trial they contended that a public road known as the Amstein Camas Valley road touched the respondents' tract and that another known as the Southwick road or the Holmes Creek road was available to them. Further, they contended that the predecessors in interest of the respondents, in going to or from the land now owned by the respondents, did so by passing through an area termed by the appellants "the back pasture."

The answer affirmatively alleges:

"That a county and public road known as the Amstein Camas Valley Road was laid out, viewed, surveyed, established, and approved by the County Court of Douglas County, Oregon, in 1903, and said road is recorded in the Road Records of Douglas County, volume 6 at p. 393.

"That above described roadway is a public road and has been used over a period of years by the plaintiffs' predecessors in interest as a means of ingress to and egress from their premises."

The affirmative averments of the answer also say:

> "There is a public road known as the Southwick Road or the Holmes Creek Road and described as following * * *; that said road has been and is now in constant use by the plaintiffs herein and their predecessors in interest, and the general public and adjoining landowners and tenants."

We shall now take notice of the evidence applicable to those contentions.

Jacob Denn, whom we have mentioned, received a deed in 1893 which conveyed to him a thousand acres lying in Sections 25, 26 and 35, and which included all of the land now owned by the parties to this suit. April 9, 1894, he gave to his son, Henry J. Denn, the father of the appellant, Henry Denn, a deed which conveyed to him the Southeast quarter of Section 26. There was no consideration for the deed; the transfer was a gift. The Southwest corner of that quarter touches the Northeast corner of the 40-acre tract now owned by the respondents. When that conveyance was made, the conveyor owned land to the west of the quarter section which he was giving to his son. Neither the retained land nor the conveyed quarter section bordered upon or in any other way touched a public road.

One Zack Murray, a witness for the respondents, who has lived in Camas Valley for more than seventy years, testified:

> "I can remember that there was a road there as long as I can remember."

By "a road" he meant the road in question. Going on, he said:

> "That has been more than seventy years. However, there were gates across that road and it has been changed in a place or two where he lives."

By "he" he meant the appellant, Henry Denn. When this witness first saw the road it ran between the house now occupied by the appellants and a barn. Later, its course was altered so that it turned to the left where it came to the barn lot and no longer passed through it. No other material change in the road was mentioned by any witness. Mr. Murray swore that the road "has been used for better than seventy years."

He also testified:

"Q. Was the road during this period of time used by different means of travel, by wagon and buggies and automobiles?

"A. Yes. The road here, of course, at that time, along in even up until the nineties they were on wagons, you know; and, however, they used that for automobiles too, those homesteaders over there; they were most of them homesteaders that used that road through there. I don't know under what arrangements or anything about that, but some of them used pack horses and some used pack sacks on their back and some had automobiles they left at the George Moore place. I don't know who lives on that place now.

"Q. Mr. Murray, was there any other road that could be used in getting to the back end of the Denn ranch?

"A. At that time?

"Q. At that time.

"A. No, no."

Upon cross-examination, the following occurred:

"Q. Do you know the actual location of this Rose quarter?

"A. Oh, yes. He has the Northeast of the Northwest Section 35, Township 20, Range 9.

"Q. Now, Mr. Murray, did this Denn road go right into and connect with this Rose quarter?

"A. Why, yes, the road that was traveled then.

There was a man by the name of Doney, he had the Southeast of the Southwest quarter and I think Fred Southwick owns that now of Section 35 and this road crossed right in the forty that Mr. Rose owns and went off and came out at the south side of his forty.

\* \* \*

"Q. What was the condition of this road you spoke of that went through the Rose property—was it a trail or a road?

"A. Oh, it was a road; it was just a dirt road like probably most of the roads were at that time."

Mr. Murray's testimony, if true, warrants a belief that long before Jacob Denn gave his son the quarter section, a road had been established across the quarter and was used as a means of access to and egress from land west of the quarter, including the 40-acre tract now owned by the respondents. The part of that road which lay between the county road and the conveyed quarter afforded access to the latter. That part crossed land owned by Jacob Denn.

Mr. A. F. C. Frear, for twenty-six and one-half years, has been county road master of Douglas County. Prior to that he worked under a former road master and at one time was deputy county surveyor. He testified that no public road touches, crosses or affords access to the respondents' property.

Bert Nealy, a witness for the respondents, who has lived for forty years in Camas Valley, has been familiar with the road across the appellants' land during all of those years. We quote from his testimony the following:

"Q. Has the road been traveled by wagon, horse, automobile and other means of transportation?

"A. Ever since I have been in the valley.

"Q. Do you know the quarter section of ground in controversy, the property owned by Mr. Rose?

"A. I have been through there a good many times, across the place.

"Q. Is there any other road that can be used as a means of ingress and egress from that forty to any county road?

"A. No.

\* \* \*

"Q. Was that road used by old Jacob Denn in hauling his grain?

"A. Yes.

"Q. In the back end of his property to market?

"A. I think so. The only road that has been in there that I know of in that time. That was the only way Jacob Denn had of getting back to the property, I think; I don't know how else he could get out."

Anna Nealy, another witness for the respondents, began forty-five years ago a course of residence upon the 40-acre tract immediately to the east of the plaintiffs'. While living there she went in and out upon the road in question. Her means of transportation, as described by her, were "horseback and with wagon once in a while." She made it clear that the road over which she traveled as long ago as forty-five years was the road in question, by saying: "The same road they are using now, only change that went through by Mr. Denn's house and barn." As we have explained, in its earlier stages the road went between the house and the barn. In some previous year, unmentioned by any witness, the course of the road was changed so that it went to the rear of the barn. The witness explained that the county road into which the alleged way of necessity empties at its eastern extremity "has been there years longer than my time."

The foregoing is a brief synopsis of the testimony given by some of the respondents' witnesses. The credibility of none of them was challenged. It will be seen that this evidence indicates that seventy years ago a roadway extended across the appellants' property which had its western end in the 40-acre tract now owned by the respondents and its eastern extremity at a county road.

The appellant, Henry Denn, 42 years of age, was born upon the property which he now owns, but he added, "I lived in town most of the time." Evidently his familiarity with the adjacent property is not intimate, for, upon cross-examination, he protested, "I don't know much about them. I don't pretend to know." He recalled the road in question from the time he was a boy, "just playing marbles." Like the other witnesses, he indicated that the present road follows its original course, with the exception of the change around the barnyard.

In 1940 one Jacob Denn, a cousin of the appellant, Henry Denn, owned the 40-acre tract which the respondents now own. That Jacob Denn was a grandson of the Jacob Denn to whom we have frequently referred, and derived his title from him. In February, 1940, Jacob Denn (the cousin) was negotiating a sale of the forty acres to one Oran C. Standley, and in its course showed Standley the property. It was the appellant, Henry Denn, who took his cousin, as prospective vendor, and Standley to the property. In going there, the party traveled over the road in question. The appellant, as a witness, made no claim that he told Mr. Standley or his cousin that they had no right to travel the road or that the latter could be barricaded at any time. In fact, if he mentioned the road during the trip

he failed to disclose that matter when testifying. Standley received a deed of conveyance February 8, 1940, and four years later conveyed the property to the respondents.

The appellant, Henry Denn, testified that during the time his grandfather owned the forty acres which the respondents now hold, he cut down and removed from it some timber, but swore that the logs were taken out "through the back pasture and around the other road." We find it impossible to gain any clear impression from this witness' testimony as to the whereabouts of the "other road." Efforts were made to elicit from others testimony concerning a road which lay in the back pasture, but their vague statements give no clear impression as to where it lay or how it connected with any existing public road. One witness, in telling about this elusive "other road", indicated that its course entered into Section 23 and "the Barney Carey place." There is no evidence that Jacob Denn owned any property in that section. It is clear that this "other road" was not a public thoroughfare.

Other testimony presented by the appellants indicates that there were gates upon the road; that is, the alleged way of necessity. Still other evidence that came from the same source endeavored to show that there was a road which led from land to the east of the respondents' and which, pursuing a southeasterly course, connected with the county road. Some of the witnesses referred to that road as the Southwick road and others termed it the Holmes Creek road. The major part of it is owned by a concern engaged in the logging industry. If we have gained the correct conception of it, it is scarcely passable at its northwestern extremity. It is clear that it is not a public road and that the respondents have no right to use it.

The appellants offered much evidence in an effort to show that a public road known as the Amstein Camas Valley road exists and that it affords the respondents access to and egress from their property. According to the record, a petition was filed in February, 1903, for the establishment of that road. Later the county surveyor and the viewers who were appointed performed the functions exacted of them by our laws. But, so far as the record shows, nothing further was done. Section 4785, Bellinger and Cotton's Code, which was then in effect, said:

> "* * * and the court being satisfied that such road will be of public utility, the report of the viewers being forwarded thereto, the court shall cause said report, survey, and plat to be recorded, and from thenceforth said road shall be considered a public highway, and the court shall issue an order directing said road to be opened."

So far as we know, that action was never taken and the road was never established. Mr. Frear, whom we have already mentioned, testified that the Amstein Camas Valley road is "only a road on paper, a paper road" and that the county never opened it nor spent a cent upon it. The trial judge took the commendable course of visiting the areas we have mentioned in an effort to gain a clearer conception of the facts. While one of the appellants' witnesses was upon the stand giving testimony which indicated that the Amstein Camas Valley road was open and subject to public use, the trial judge addressed him as follows:

> "You remember you were in there the day that Mr. Green and Mr. Felker and I were there, and Henry, I didn't see any evidence of that Amstein road back in there any place; I couldn't find any evidence of it being used in there or couldn't find the location of it on the ground. It hasn't been

used for many years as far as the Rose property is concerned, has it?''

The witness replied:

''I presume that it hasn't been used for quite a few years.''

We think that the Amstein Camas Valley road never achieved even the status attributed to it by Mr. Frear's expression, ''a paper road.'' Evidently the efforts to establish it were abandoned before the time occurred for the county court to enter the order authorized by § 4785, Bellinger and Cotton's Code.

In March, 1907, Jacob Denn, father of Henry J. Denn, who still owned large tracts east of the quarter section which he conveyed to his son in 1894, deeded to the latter:

''A strip of land 120 wide off the North side (of) the South East quarter of Southwest of Section Twenty five. Also a strip of land 120 feet wide off the north side of the South West quarter of the Southeast quarter of Section twenty five, Excepting therefrom a strip of land sufficient in width for a wagon road on the South side of said strip of land hereby conveyed    *    *    *.

''Also a strip of land 120 feet wide off the North side of Lot No Four of Section Twenty five, excepting therefrom a strip of land sufficient in width for a wagon road on the South side of said Lot Four    *    *    *.''

In May, 1921, the heirs of the aforementioned Jacob Denn signed a quitclaim deed which conveyed to appellant Henry Denn's father the Northwest quarter of the Southwest quarter of Section 25,

''save and excepting therefrom a strip of land thirty (30) feet wide across the South end of said Northwest quarter of the Southwest quarter (NW

¼ of SW ¼). * * * The Southeast quarter of the Southwest quarter (SE ¼ of SW ¼) of Section Twenty-five (25), (Save and excepting therefrom a strip of land 100 feet wide across the North end of said Southeast quarter of the Southwest quarter.)

"A strip of land described as follows: Beginning at a point 11.99.8 feet North of the one quarter corner, between Sections Twenty-five and twenty-six (25 & 26), running thence East parallel with one sixteenth line, 1969 feet; thence North twenty feet; thence west 1969 feet; thence south twenty feet, to the place of beginning and containing ninety-two one hundredths (.92) acres."

The respondents argue that the provisions in those deeds for roadways warrant an inference that when Jacob Denn conveyed additional lands to his son he wished the assurance of written words that he would have access to his remaining lands which lay far west of the county road. They make the same argument concerning the deed executed by the heirs. In any event, the reservations indicate that the owners of land in the vicinity of the respondents got in and out by the contested road.

The deed which Jacob Denn and his wife gave to their son, Henry J. Denn in 1894 said:

"* * * does hereby covenant to and with the said Henry Denn, his heirs and assigns, that they are the owners in fee simple of said premises, that they are free from all incumbrances, and that they will warrant and defend the same from all lawful claims."

The above is a review of all the evidence which indicates whether or not the property now owned by the respondents has had at any time access to and egress from a public highway except over the road which leads across the appellants' lands.

We believe that the evidence clearly warrants a finding that for about seventy years before this suit was filed a road extended across the land now owned by the appellants. Evidently the road was in use for fifteen years or more before Jacob Denn, the grandfather of appellant Henry Denn, received the conveyance in 1893 of the thousand acres, which included all of the land now owned by the appellants and the respondents. It is that road which the decree of the Circuit Court holds is a way of necessity available to the respondents. We think that the road was clearly defined and that its purpose was obvious in 1894 when Jacob Denn gave his son a deed to the Southeast quarter of Section 26. It will be observed that the son, Henry J. Denn, father of appellant Henry Denn, upon receiving his father's deed, could not reach the quarter section which was given to him without crossing land owned by his father and which the latter retained. The father's retained land lay between the county road and the conveyed quarter section. Likewise, the father had no practical, if any, way of getting to or from his lands which lay west of the conveyed Southeast quarter of Section 26 without crossing the quarter section. Obviously, the route which both father and son were compelled to employ was the road in question. In short, the father crossed his son's land and the son crossed his father's. No one claims that either of them ever endeavored to deny the other use of the road. According to the evidence, a gate, or possibly more than one, was encountered along the road. We think, however, that the purpose of the gates was not to exclude those who were traveling to properties remote from the county road, but to restrain wandering livestock. The presence of the gates, of course, indicates that they were a part of fences which

bordered the road; in fact, some witnesses mentioned the fences. The latter further defined the course of the easement and set it apart from the adjacent fields. Finally, we are satisfied that no effort was made until recently to prevent anyone from using the road who had occasion to go to the respondents' 40-acre tract.

■ From § 474, Restatement of the law, Property, we take the following:

> "When land in one ownership is divided into separately owned parts by a conveyance, an easement may be created, within the limitations set forth in §§ 475 and 476, in favor of one who has or may have a possessory interest in one part as against one who has or may have a possessory interest in another part by implication from the circumstances under which the conveyance was made alone."

Manifestly, no one probed the mind of Jacob Denn in 1894 when he handed the aforementioned deed to his son, Henry J. Denn, and in that manner discerned his wishes concerning the contested road. But, as we see from the language just quoted, we are justified in analyzing the circumstances of which we have taken notice for the purpose of ascertaining whether the conveyor, by implication, reserved an easement over the conveyed tract.

From § 476, Restatement of the Law, Property, we quote:

> "In determining whether the circumstances under which a conveyance of land is made imply an easement, the following factors are important
>
> (a) whether the claimant is the conveyor or the conveyee,
>
> (b) the terms of the conveyance,
>
> (c) the consideration given for it,

(d) whether the claim is made against a simultaneous conveyee,

(e) the extent of necessity of the easement to the claimant,

(f) whether reciprocal benefits result to the conveyor and the conveyee,

\* \* \*.''

It will be recalled that the deed which Jacob Denn gave to his son in 1894 was a general warranty deed. Although the appellants do not claim that the terms of that instrument preclude the existence of the alleged easement, we believe that it is well to take note of the following comment appended to § 476 of the Restatement, at page 2980:

''\* \* \* Thus, the fact that a conveyance is in the form of a deed containing or implying a covenant against incumbrances \* \* \* is an item adverse to the claim of the implication of an easement in favor of the conveyor. That a conveyance contains such covenants does not necessarily or, in fact, often rebut an otherwise existing implication. Despite them, other circumstances may justify the implication in favor of the conveyor. \* \* \*''

That statement is followed with the following illustration:

''A is the owner of two adjoining tracts of land, Blackacre and Whiteacre. Blackacre has access to a highway, while Whiteacre is shut off from highways by Blackacre and the lands of other parties. A conveys Blackacre to B. The language of the conveyance contains a general covenant against incumbrances. Despite this covenant, A is entitled to an easement of way over Blackacre to the highway.''

At page 2981, the comment says:

''\* \* \* If a conveyance is gratuitous the implications are less favorable to the conveyee than is

true if he pays value for it. In a gratuitous conveyance the conveyor may be assumed to intend to convey relatively little more than is indicated by the language of the conveyance. * * * As the fact and the extent, if any, of consideration makes clearer the implication of an easement in favor of a conveyee, the lack of, or the smallness of, consideration is a circumstance favorable to the conveyor when an implication is claimed in his favor.''

The comment following § 476 says, at page 2982:

''In the implication of an easement it is important, as pointed out in Comment c, to consider whether the easement is claimed by the conveyee against the conveyor or by the conveyor against the conveyee. It is also important to consider whether it is claimed against a simultaneous conveyee. Where the claim is thus made, the implication is stronger than where the claim is made against the conveyor himself. It is reasonable to infer that a conveyor who has divided his land among simultaneous conveyees intends that very considerable privileges of use shall exist between them. Commonly, in such cases, the conveyance constitutes a family distribution, and, where this is true, the probability of a desire that existing conveniences shall continue to be operative is greater than the probability that a conveyor would desire them continued as against himself. In such cases, the fact that the conveyance is wholly gratuitous is of relatively little significance.''

Going on we find at page 2983:

''In the greater number of cases, its necessity to the use of land of the claimant is the circumstance that contributes most to the implication of an easement. If no use can be made of land conveyed or retained without the benefit of an easement, it is assumed that the parties intended the easement to be created. This is true not only where

it is claimed by the conveyor but also where it is claimed by the conveyee. It is assumed that the parties could not have intended that the land retained by the conveyor should be useless in his hands, though the assumption may not have too firm a foundation in fact. The inference as to intention which is made is influenced largely by considerations of public policy in favor of land utilization.

※　　※　　※

"If the necessity of an easement is such that without it the land cannot be effectively used, nothing less than explicit language in the conveyance negating the creation of the easement will prevent its implication. If some use may be made, or if an alternative to the easement which might otherwise be implied can be secured, the implication becomes subject to control by other circumstances. Thus, the expense and effort necessary to secure a substitute by the conveyor may not be so disproportionate but that it may be assumed he was intended to suffer it, while like expense to the conveyee may warrant the inference that he was not intended to suffer it. * * *."

We resort again to the comment. This time to page 2985:

"That the conveyor and the conveyee receive reciprocal benefits from the implication of an easement in favor of each contributes to the implication. The fact that both receive benefits and neither alone suffers from the creation of the easement makes it more probable that they intended its creation. Hence, even in cases where the necessity alone would not have been sufficient to justify the implication of an easement in favor of the conveyor, the fact that the circumstances are sufficient to warrant the implication in favor of the conveyee, and that like benefits would accrue to both the conveyor and the conveyee, may justify the

inference that an easement in favor of each was intended. * * *."

Finally, we take the following from page 2988:

"* * * Each party to a conveyance is bound not merely to what he intended, but also to what he might reasonably have foreseen the other party to the conveyance expected. Parties to a conveyance may, therefore, be assumed to intend the continuance of uses known to them which are in a considerable degree necessary to the continued usefulness of the land. Also they will be assumed to know and to contemplate the continuance of reasonably necessary uses which have so altered the premises as to make them apparent upon reasonably prudent investigation. The degree of necessity required to imply an easement in favor of the conveyor is greater than that required in the case of the conveyee (see Comment c). Yet, even in the case of the conveyor, the implication from necessity will be aided by a previous use made apparent by the physical adaptation of the premises to it. Illustration:

"A is the owner of two adjacent tracts of land, Blackacre and Whiteacre. Blackacre has on it a dwelling house. Whiteacre is unimproved. Drainage from the house to a public sewer is across Whiteacre. This fact is unknown to A who purchased the two tracts with the house already built. By reasonable effort, A might discover the manner of drainage and the location of the drain. A sells Blackacre to B who has been informed as to the manner of drainage and the location of the drain and assumes that A is aware of it. There is created by implication an easement of drainage in favor of B across Whiteacre."

Most of the above principles governing the implication of an easement by way of necessity have received recognition by this court. Some of our holdings are: *Ford v. White,* 179 Or. 490, 172 P. 2d 822; *Penn Mutual*

*Life Ins. Co. v. Nelson,* 170 Or. 248, 132 P. 2d 979; *Dean v. Colt,* 151 Or. 331, 49 P. 2d 362; *Beck v. Lane County,* 141 Or. 580, 18 P. 2d 594; *Fendall v. Miller,* 99 Or. 610, 196 P. 381; *Tucker v. Nuding,* 92 Or. 319, 180 P. 903; *Brown v. Kemp,* 46 Or. 517, 81 P. 236.

A well-reasoned decision by the Pennsylvania court, which the respondents called to our attention, is *Liquid Carbonic Co. v. Wallace,* 219 Penn. State 457. For a good short discussion, see 19 Or. Law Rev. 362. Nothing said in *Malsch v. Waggoner,* 62 Wash. 470, 114 P. 446, which has been submitted to us, detracts in any way from the rules interpreting the effect of evidence submitted for the establishment of an implied way of necessity. That decision says:

> "Appellants further contend * * *; that their south lands, as they express it, are land-locked, and that they have no other practicable means of ingress or egress. These contentions are not supported by the evidence. * * *
>
> * * *
>
> "There was, however, no necessity for the implied easement for which appellants contend. The evidence disclosed that * * * there is another possible and practicable way from the south lands to the county road entirely within tract C."

Those appellants were the owners of tract C.

We deem it unnecessary to discuss the controlling principles of law any further. They are well set forth in the material we quoted from the Restatement. Most of the language which we took from the Restatement is not law, but common-sense reasoning. It appeals to us as sound and practical. It shows a superior method of determining whether or not an inference is warranted that an easement, of necessity, was impliedly granted or reserved.

■ There remains for expression only our application of those principles to the facts before us. When Jacob Denn, in 1894, made his son, Henry J. Denn, a gift of the Southeast quarter of Section 26, he still owned large tracts of land west and east of the conveyed quarter section. Unless he employed the road in question, he could not reach his lands west of the conveyed quarter section except by pursuing a circuitous course through an undefined area which some of the witnesses termed "the back pasture." That route seemingly involved passage over the property of others. We know of nothing in the record which shows that any appreciable use was ever made of the back pasture route. We are satisfied that Jacob Denn never used it as a means of reaching the county road. The equivocal references to that route made by a couple of witnesses certainly cannot justify a holding that it constituted a practical means of reaching the property now owned by the respondents. The road in question was, we think, indispensable to both conveyor and conveyee. It was of reciprocal value to each. It afforded the father the means of reaching the lands to the west of the conveyed quarter section, and enabled the son to go from his newly-acquired tract eastward across his father's land to the public thoroughfare. When the father, in 1894, gave his son the deed, the road was well defined upon the ground and obvious to both conveyor and conveyee. It would be absurd to believe that the father who gave the deed as a gift, possibly in the nature of a family distribution, intended that the easement, of great value to him, should be blotted out. In view of all the circumstances and the fact that the conveyee paid nothing for the conveyance, we do not believe that the language of the deed, which is quoted in a preceding paragraph, fore-

closes the alleged implied easement. We think that it is clear that both grantor and grantee intended to reserve, across the conveyed quarter section, a way of necessity, and that a similar easement was reserved in subsequent conveyances. In short, we believe that the alleged way of necessity exists, and that the decree of the Circuit Court is correct. That decree is affirmed.

---

ON PETITION FOR REHEARING.

*Avery W. Thompson* and *William D. Green, Jr.,* of Roseburg, for appellants.

*Geddes & Felker,* of Roseburg, for respondents.

Before LUSK, Chief Justice, and BRAND, ROSSMAN, BAILEY, HAY and PAGE, Justices.

ROSSMAN, J.

The appellants' petition for a rehearing says:

"The Court erred in stating on page 9 of its opinion, 'There is no evidence that Jacob Denn owned any property in that section 23).' (See plaintiffs' Exhibit J)."

Exhibit J was the inventory filed in the estate of Jacob Denn, deceased. It was signed in 1915 and listed the property which the deceased owned at the time of his death in 1915. The list included some land in Section 23, but, of course, does not indicate when it was acquired. As stated in our previous opinion, in language which the petition does not challenge, Jacob Denn received a deed in 1893 which conveyed to him approximately 1,000 acres of land lying in Sections 25, 26 and 35. The deed conveyed nothing situated in Section 23. One year after he received the conveyance

just mentioned he gave to his son, Henry J. Denn, the quarter section across which, our previous opinion held, he reserved an easement in the form of a road. The reservation which we recognized was not by express grant, but by implication. So far as the record indicates, Jacob Denn owned nothing in Section 23 when he made the gift. In determining whether or not the parties intended to reserve to Jacob Denn, the conveyor, an easement across the conveyed land, the court is, of course, controlled by the facts and circumstances as they existed at the time of the gift, that is, in 1894.

We do not know when Jacob Denn came into ownership of the property in Section 23 which the inventory lists. When we wrote our criticized sentence, we assumed that all would understand that we had reference to the crucial year, 1894. The facts mentioned in Exhibit J are immaterial.

The petition for a rehearing also says:

"The court erred in ruling that the Amstein Road was never opened as it is the understanding of the petitioners that appellants' Exhibit 1 includes an order of the County Court opening the road which made the road a public road whether or not it was ever improved by the County."

After receipt of the petition for a rehearing, we read the transcript of evidence again and once more examined all of the exhibits. The latter consist in large part of copies of deeds and other records. During the trial the court received in evidence, upon the proffer of appellants, copies of a county court record which was intended to establish as a public road a thoroughfare to be known as the Amstein Camas Valley Road. The record comprised many documents and the exhibit consisted of copies of the latter. The copies,

with the exception of one, were photostatic and all of the latter were fastened together. The single exception was a typewritten copy of an order which we will presently quote. It was not attached to the others. Across the top of the first page of the photostatic copies was written in large script this appellation: "Amstein Camas Valley Road." The single unattached typewritten sheet had no appellation.

The brief which the appellants filed when this cause was submitted mentioned no part of any of the records just designated. It did not allude to Exhibit 1 or to any document included within it and nowhere employed the name, Amstein Camas Valley Road. Before quoting the sole reference in the brief to that road, we explain that the word "roadway" and the phrase "another route to the county road through his own 'back pasture' " in the quoted passage do not refer to the Amstein Camas Valley road. We now quote from the brief:

"Furthermore, at the time of the deed, the roadway, if there was such, was not necessary to the beneficial enjoyment of the land deeded or the land retained since Jacob Denn, the ancestor, and the executor of his estate after his death preferred to use another route to the county road through his own 'back pasture' and over his own property which lays west and north of the appellants' property as included in the 1894 deed (Tr. 60, 61, 67). This does not even mention the other routes south and east of the respondents' property (Tr. 58, 62, 63, 66)."

Thus, the only allusion in the entire brief to the purported Amstein Camas Valley road was this: "the other routes south and east."

█ Due to the above circumstances, we overlooked

the typewritten copy of the part of the County Court's record which the appellants' petition for a rehearing mentions. The material part of that record follows:

"Friday, May 8th, 1903:

"In the Matter of the
Rudolph Amstein-Camas } SECOND READING
Valley Road

"Now at this time comes on for reading the report of the viewers upon the Amstein Camas Valley road. Report being favorable, the road is ordered opened.

(Journal signed)    M. D. Thompson,
Attest:                                    Judge.
D. R. Shambrook, Clerk."

We explained the circumstances in order to show how it happened that we overlooked the order and for the purpose of suggesting that whenever an exhibit consists of several papers they should be fastened together and marked in such a manner that they will be a unit. A brief should refer to an exhibit by an identifying name or symbol whenever reliance is placed upon it.

In view of the fact that the appellants' brief did not depend upon the alleged Amstein Camas Valley road, we would have been justified in ignoring the purported road, but since it commanded attention during the trial in the Circuit Court, our opinion gave it consideration.

When the order above quoted was made, § 4785, Bellinger and Cotton's Code, was in effect. The material part of that section is quoted in our original opinion. We do not believe that the order which the County Court entered met the requirements of

§ 4785. It did not declare that the court was "satisfied that such road will be a public utility" nor did it order that the "report, survey and plat" be recorded. But, even if the order could be deemed adequate, still we do not believe that the order alone helped the appellants' cause.

■ Normally, an easement in the form of a way of necessity terminates when the necessity ceases, as through the construction of a public thoroughfare which serves the dominant estate. Since it was in 1894 that the father gave his son the quarter section over which it is said he reserved a roadway, the easement was created in that year—if it was created at all. The order which it is claimed created the Amstein Camas Valley road was not signed until 1903. The appellants claim that it terminated the necessity for using the easement and thereby extinguished the easement. As our previous opinion points out, the Amstein Camas Valley road was never improved. The route which the surveyors selected for it remained in its natural state and was still in that condition on the day of the trial. For one to reach the respondents' land from the county road by means of the route surveyed for the unbuilt Amstein Camas Valley road would have necessitated travel for about a mile and a half through primeval land and, unless we are mistaken, over an unbridged stream. Our previous decision quotes from the testimony of Mr. A. F. C. Frear, who for 26½ years has been the roadmaster of Douglas County, that the county never spent a cent upon the purported Amstein Camas Valley road. He referred to the latter as "a paper road." The trial judge who, as our opinion says, visited the area in which the properties in controversy are situated, could find no

trace of the Amstein Camas Valley road. Although diligent efforts were made by the appellants to show that this or that person had traveled upon some part of the so-called Amstein Camas Valley road, no one testified that he had done so. Even the name was a stranger in the ears of some of the witnesses. Plainly the route was never used or traveled.

■ In 1903, when the order which the petition cites was entered, the road upon which the respondents depend was twenty or so years old and had served Jacob Denn for nine years. We do not think that the mere adoption of the order of the County Court above quoted ended the necessity to use the road. The necessity was unaffected by the adoption of the order. The latter, if valid, and we do not think that it was, was immaterial to the issues of this case. Had the contemplated road been rendered usable, that fact would have been material.

The fact that the appellants' petition for a rehearing mentions the above details indicates that they misconstrued our opinion. In inferring that the father reserved, and that the son granted to the father, an easement over the conveyed land, we did not draw our inference from necessity alone. The necessity for a passageway was only one of the circumstances which we deemed significant. It may be that our use of the term ''way of necessity'' misled the appellants. That type is only one form of an implied easement. We will attempt to make matters clearer by going over some phases of the case again.

We did not interpret the evidence as indicating that when Jacob Denn, in 1894, gave to his son the quarter section over which the respondents claim he reserved an easement, the property which the father

retained west and southwest of the conveyed quarter section was landlocked. We thought that we made it clear that the father owned land to the north and east of the quarter section. That land extended all of the way to the county road which is indicated upon the plat which accompanies our previous decision. Possibly the father could have made his way to the county road by going over that land. The distance was about two miles. As nearly as we can glean from the record, the land north and east of the conveyed quarter section was partially covered with timber and crossed by a stream. It is through that area that the father would have been compelled to wend his way in going from the land which the respondents now own to the county road. No witness testified that anyone ever took that course, but, in theory at least, it was possible. Witnesses spoke of the "back pasture" route, but, as our previous decision indicates, that route went through Section 23, and it does not appear that the father owned any land there in 1894. Our opinion reviewed the testimony of witnesses who swore positively that the only means of getting from the land which the respondents now own to the county road was by means of the lane which our decision recognized as an easement. Very likely those witnesses, who were farmers and settlers, were concerned with practical matters and not with a theoretical way of going through the untamed land. We think that their testimony reflects the truth. We know of nothing in the record which shows that anyone drove a wagon from the property now owned by the respondents to the county road by any route except over the lane which we held is an easement. We reviewed these phases of the evidence again for the purpose of making it clear that (1) when

the father gave to his son a deed to the quarter section, the land which the respondents now own was not landlocked; and (2) the only practical method of going from the land now owned by the respondents to the county road was over the alleged easement.

As we have said, Jacob Denn in 1893 purchased a piece of land comprising one thousand acres which included the tracts now owned by the appellants and the respondents. It embraced all of the land over which the road extends. The thousand-acre tract was, roughly speaking, rectangular in shape and the road somewhat paralleled the longer sides of the rectangle. The road was nothing more than a wagon road in 1893, but its contours were plainly visible. Witnesses, in mentioning it, spoke of fences, gates and a cattle guard. Hence, it seems permissible to infer that the course of the road was defined, not only by the clearings through which it ran and the wagon tracks left behind by vehicles which had passed over it, but also by stretches of fence. The road was used by those who had occasion to leave the county road and visit the land which lay west of it comprising that which Jacob Denn acquired in 1893 and other land beyond his. The western extremity of the road was in the 40-acre tract which the respondents now own. Its eastern end was in the county road to which we have made frequent reference. Thus, the entire length of the road, about two miles, was upon property of which Jacob Denn was the owner.

Frequently when the owner of real property so employs it that one part of it receives a service which another part renders through the medium, for example, of a drain or a road, we term the road or drain a quasi easement in order to express more readily the

manner in which the favored part has become dominant and the other servient. When, in such instances, we use the term quasi easement, we realize the inaccuracy and recognize that normally no one can possess an easement over land which he himself owns. Yet the term quasi easement, when used in such situations, facilitates understanding.

In 1893, as we have seen, the western extremity of the road in question was in the 40-acre tract which the respondents now own, but which Jacob Denn had purchased in that year. When the road left that tract it shortly entered and then crossed the quarter section which the appellants now own, but which Jacob Denn then owned. Had Denn been familiar with legal terms and principles, he would have deemed the 40-acre tract as the dominant tenement, the quarter section as the servient tenement and the road as a quasi easement. The terms would have been inaccurate, but they would have served their purpose.

One year after the father made his purchase and the property had assumed the features which we just described, he gave to his son, Henry J. Denn, the quarter section which the appellants now own. We have just deemed it as the servient tenement. The conveyance severed the ownership and made possible a technical easement with its accompaniment of dominant and servient estates. The question which this appeal propounds is this: When the father made that gift, did he then intend to forego the road, surrender up his right to use it and authorize his son to erect a barrier where the road leading from the dominant tenement entered the servient one? Or did father and son intend to preserve the relationship of the two tenements to each other and reserve to the father an

easement across the conveyed property so that he could get in and out of his retained land without constructing a new road about two miles long?

We shall mention another fact. It received attention in our previous opinion. When the son received the conveyance of the quarter section, he had no way of getting to his property without using the very road with which we are concerned. The quarter section was completely landlocked. On three sides of it lay land owned by the father and on its fourth side was an area held by strangers. The road in question, after originating upon the 40-acre tract now owned by the respondents and crossing the quarter section, extended a mile easterly over lands held by the father, and in that manner reached the county road. Thus, the son himself needed a way of necessity, and the road in question was the very right of way which he required. It appears that he and his successors, the appellants, have constantly used it. It can, therefore, be inferred that when the father gave his son the quarter section he also gave him, as an appurtenance to the quarter section, an easement across the father's large tract to the east. That easement, in the form of a way of necessity, was a one-mile stretch of the road with which we are concerned.

When the dispute about the road arose about four years ago, both father and son were dead and, hence, no help could come from their lips. When the transaction between them took place nothing was written except the deed and, as our previous opinion states, it included a warranty. The latter is adverse to the respondents' contentions, but not fatal to them.

The evidence which indicates whether or not the father reserved, and the son granted, the alleged easement must be found in the circumstances which at-

tended the making of the gratuitous conveyance. There is nothing novel about the fact that we must look to circumstantial evidence, for the courts frequently resort to evidence of that kind.

The circumstances which show whether or not father and son intended that the road should remain open to the former are these: (1) The father after giving his son the quarter section still owned property west and southwest of the conveyed quarter section. (2) The conveyance to the son was unaccompanied by any consideration and was a gift. (3) The father had no practical means of access to or egress from his land west and southwest of the conveyed quarter section except by the road. (4) The son, after receiving the quarter section, had no means of going to or from it except over the part of the road which lay upon property owned by the father east of the quarter section; in other words, he had need of a way of necessity over the father's land. (5) The road had been in use for many years; its contours were well defined and plainly visible; its purposes were self-evident. (6) The land which the father retained west and southwest of the conveyed land lay almost two miles from the county road, and although no witness estimated the cost of building a road from the retained land to the county road, it is obvious that the cost would have been large. (7) The land over which the easement is claimed is the conveyed land. (8) Since the son had need for the part of the road which lay upon his father's land east of the quarter section, the easement in its entirety extended over land owned by both the father and the son.

The authorities devote much space to a delineation of the circumstances under which an implication may

be drawn that a quasi easement became a technical one upon severance of ownership. It is apparent that discord exists in the decisions and that many of them employ rules difficult of application.

In 28 C. J. S., Easements, § 34, page 694, it is said:

"Where the owner of an entire tract of land or of two or more adjoining parcels employs a part thereof so that one derives from the other a benefit or advantage of a continuous, permanent, and apparent nature, and sells the one against which such quasi easement exists, such easement, if necessary to the reasonable enjoyment of the property retained, is, under what is perhaps the more generally accepted rule, impliedly reserved to the grantor, no distinction being made between the circumstances under which an easement is regarded as impliedly granted and those under which one is regarded as impliedly reserved. Other authorities, however, urge that a grantor should not be permitted to derogate from his grant and accordingly in many jurisdictions the rule is established that, where there is a grant of land without express reservation of easements, there can be no reservation by implication, unless the easement is strictly one of necessity, particularly where the grant is with full covenants of warranty."

Thompson on Real Property, Perm. Ed., § 502, says:

"The authorities are in conflict as to the degree of necessity required to create an easement of way by implication on the severance of an estate. In this country, the cases usually hold that to create an easement of way by implied grant it must be necessary to the proper enjoyment of the land, or reasonably necessary, according to the weight of authority. There are cases which hold that the way must be strictly necessary. * * * A right of way has no existence during the con-

tinuance of unity of seizin, and upon severance of
the tenement, it does not pass unless it is a way
of necessity or the operative words of the convey-
ance are sufficient to grant it de novo. Upon con-
veyance of a parcel of land, the grantor retains
no right of way over it to and upon his adjoin-
ing land, unless he expressly reserves the right, or
it is implied as a way of necessity, although there
is existing a way over the granted land, which has
been known as a street, and was so marked on a
plan. * * * A way of necessity to and from lands
otherwise inaccessible is created, not because in-
dispensable to the grantee, but it arises by im-
plication of law in order to effectuate the presumed
intention of the parties. It does not rest on mere
convenience or unusual benefit. Thus, if one con-
veys a part of his land to another in such form as
to deprive himself of access to the remainder, there
is a legal presumption that the conveyance was
with the understanding of the parties that the
grantor reserved a way across the portion con-
veyed. * * *."

Tiffany, Real Property, 3d Ed., § 781, states:

"If the owner of land, one part of which is
subject to a quasi easement in favor of another
part, conveys the quasi dominant tenement, an
easement corresponding to such quasi easement is
ordinarily regarded as thereby vested in the grantee
of the land, provided, it is said, the quasi easement
is of an apparent, continuous and necessary char-
acter. The conveyance of a thing imports a grant
of it as it actually exists at the time the convey-
ance is made, unless the contrary intention is mani-
fested in the grant. It has been started that 'the
moment a severance occurs by the sale of a part,
the right of the owner to re-distribute the properties
of the respective portions ceases and easements or
servitudes are created corresponding to the benefits
and burdens mutually existing at the time of the

sale. This is not a rule for the benefit of purchasers, only, but is entirely reciprocal. Hence, if instead of a benefit conferred a burden has been imposed upon the portion sold, the purchase, provided the marks of this burden are open and visible, takes the property with a servitude upon it. The parties are presumed to contract in reference to the condition of the property at the time of the sale, and neither has a right, by altering arrangements then openly existing to change materially the relative value of the respective parts.'

"It is perhaps unfortunate that the courts, in determining whether, in a particular case, an easement corresponding to a pre-existing quasi easement has passed with the land, having usually failed to recognize that the question is primarily one of construction, and have instead undertaken to lay down absolute rules as to what characteristics the particular easement or quasi easement must have, implying that, if it has these characteristics, the easement will pass as a matter of law. The characteristics ordinarily referred to in this connection are, as above indicated, that the user be apparent, that it be continuous, and that it be necessary, each of which will be hereafter discussed in turn. But it does not seem that the presence or absence of any or all of these characteristics should be conclusive. * * * "

From 17 Am. Jur., Easements, § 34, page 948, we take the following:

"Various elements are essential to create an easement by implication upon the severance of the unity of ownership in an estate. They are: (1) A separation of the title; (2) necessity that, before the separation takes place, the use which gives rise to the easement shall have been so long continued and obvious or manifest as to show that it was meant to be permanent; and (3) necessity that the easement be essential to the beneficial enjoyment

of the land granted or retained. Another essential is sometimes added to these—namely, that the servitude be continuous, as distinguished from temporary or occasional. * * * "

■ It is seen from the passages which we quoted from the above authorities that the courts have employed various conflicting tests in determining whether upon severance of ownership a quasi easement became a technical one. One of the tests, it will be noticed, was whether or not the servitude was continuous or discontinuous. *German Savings & Loan Society v. Gordon*, 54 Or. 147, 102 P. 736, bestowed considerable analysis upon the distinction between a continuous and a discontinuous servitude, and then held:

> "We are unable to discover any valid reason for a distinction in the rules of law applicable to servitudes depending upon whether they are continuous or discontinuous, except in the matter of the greater conspicuity which the former usually affords. An artificial ditch in which water regularly flows must necessarily be a constant reminder to all beholders of the changed condition of the surface of the earth whereby the dominant tenement is drained or irrigated by the conduit which is appurtenant thereto. * * * A discontinuous quasi easement when evidenced in a similar substantial manner ought to pass by implied grant as an appurtenant to the dominant tenement when the latter is severed by a conveyance thereof."

To that extent at least that decision simplified the test for determination whether or not the parties intend, when severance of ownership occurs, that an existing servitude should become an easement. "Continuous or discontinuous" is no longer the test in this

state. "Conspicuity" was substituted by that decision for that phase of the text. Restatement of the Law, Property, § 476, expresses that feature of the test thus:

"(h) the extent to which the manner of prior use was or might have been known to the parties."

The German Savings & Loan Society decision was concerned with still another detail of the test. The case involved lots 1, 2, 7 and 8 of a subdivision of Portland. Lots 1 and 2 fronted upon Hood Street; lots 7 and 8, immediately to the rear of those lots, fronted upon Corbett Street. Upon lots 1 and 2 stood a dwelling house facing Hood Street. It was occupied by one Mrs. Leaner Gray, owner of the lots. In 1891 she conveyed lot 7, with the exception of a strip 5.125 feet wide off its north side, to the defendant who presently improved the part conveyed to him with dwelling house. Mrs. Gray converted the narrow strip she reserved into a passageway leading from Corbett Street to the rear of her house. Thus, her house, fronting as it did upon Hood Street, had access by means of the passageway to Corbett Street. The passageway was 5.125 feet wide and about 90 feet long. Later, Mrs. Gray mortgaged lots 1, 2 and 8 to the plaintiff, and still later defaulted in meeting the mortgage indebtedness. Through foreclosure sale the plaintiff became the owner of lots 1, 2 and 8. After the foreclosure sale and after a deed had been delivered to the plaintiff, Mrs. Gray conveyed to the defendant the fractional strip we have mentioned. The defendant then closed the passageway. This court affirmed the decree of the Circuit Court which held that the servitude to which Mrs. Gray subjected the strip when she was owner of the entire estate became an easement upon sever-

ance of ownership. In so doing and in affirming the award of an injunction, the decision said:

"In the case at bar, though the plaintiffs' tenants can pass over its own land across lot 8 to Corbett street, so that the passageway is not an absolute necessity, we are satisfied that the stairs and walk as laid by Mrs. Gray serve as a more convenient way, and believe them to be reasonably necessary to the enjoyment of the property * * *."

That language renders it clear that reasonable necessity suffices. It should be observed that notwithstanding Mrs. Gray's home fronted for the width of two city lots upon Hood Street, access to Corbett Street by means of the contested passageway was sustained. That decision is by no means a novelty. Several others to like effect from other jurisdictions could be cited. Each depended, in part, upon the element of necessity although, in defining the latter, terms like "necessary for convenience and comfortable enjoyment" were used. Therefore, in the present instance, even though Jacob Denn might have been able to reach the county road through the back pasture, that circumstance would not in itself be fatal to the alleged easement.

By reverting to our original decision, it will be seen that it quoted in large part the test written by Restatement of the Law, Property, § 476. We believe that that test is in harmony with our prior opinions, although its phraseology is an improvement over the language which they employed. That test permits courts which are confronted with an alleged implied grant or reservation of an easement to give proper weight to all the evidence which bears upon the intention of conveyor and conveyee. It will be recalled

from the passage we quoted from Tiffany on Real Property that that writer deemed it "unfortunate that the courts, in determining whether in a particular case, an easement corresponding to a pre-existing quasi easement has passed with the land, have usually failed to recognize that the question is primarily one of construction." The rule offered by the Restatement deems the question one of construction and permits the courts to weigh all of the circumstances attendant upon the conveyance for the purpose of determining whether conveyor and conveyee intended that an easement should be created. So-called necessity is only one of the items to which attention should be given. In some instances, like those in which (1) an adequate consideration was paid, (2) the claimant is the conveyor and executed a warranty deed, (3) no reciprocal benefits resulted, and (4) the servitude was not clearly defined, necessity must be more pressing than in instances where other elements speak up in behalf of the alleged easement. The test suggested by the Restatement is merely a method of determining from the available circumstantial evidence whether or not conveyor and conveyee intended when the conveyance took place that a servitude, then in existence, should be preserved as an easement. If the parties had no thoughts at all upon the subject, then, since no easement was intended, none can be awarded by the court's decree. If they intended that the servitude should become an easement, the court's decree should give effect to their wishes.

■ As stated in our previous decision, we think that the circumstances clearly indicate that father and son intended that the existing servitude should remain as an easement, affording the father access to the county

road from the land which he retained west and southwest of the tract he gave to his son.

The above suffices for a consideration of everything submitted by the petition for a rehearing. The petition is denied.

Page, J., did not participate in this decision.

Bailey, J., dissents.

LUSK, C. J.

I think that the evidence establishes the easement in question, and therefore concur in the denial of the petition for rehearing.