Argued February 7, reversed and remanded June 27, 1951

# STATE HIGHWAY COMMISSION *v.* DEAL ET AL.

233 P. 2d 242

*Samuel A. Hall,* Assistant Attorney General, of Salem, argued the cause for appellant. With him on the brief were George Neuner, Attorney General; J. M. Devers, Assistant Attorney General and Chief Counsel for Oregon State Highway Commission; C. W. Enfield, Assistant Attorney General; and Robert L. May, Jr., all of Salem.

*Allan Hart* and *Gerald J. Meindl,* of Portland, argued the cause for respondents. With them on the brief were Pendergrass, Spackman & Bullivant, of Portland.

Before Brand, Chief Justice, and Rossman, Lusk, Latourette and Tooze, Justices.

LUSK, J.

The plaintiff, State of Oregon, through its State Highway Commission, has appealed from a judgment based on the verdict of a jury in a condemnation action.

The lands involved were taken by the state on March 23, 1946, to form a part of a relocated section of the Oregon Coast Highway in Lincoln County about midway between the cities of Newport and Depoe Bay and a few miles north of Agate Beach. There are three tracts, referred to in the record as Parcel No. 1, Parcel No. 2 and Parcel No. 3. Parcel No. 1, containing 7.66 acres, was owned by the defendants, W. K. Deal and wife and Curtis E. Christy and wife; Parcel No. 2, containing 0.41 acres, and Parcel No. 3, containing 0.64 acres, were owned by the defendants Christy. Lincoln County, also named as a defendant, is not a party to this appeal and need not be again referred to.

In their answer to the complaint the defendants alleged the reasonable market value of their lands on March 23, 1946, to be as follows: Parcel No. 1, $16,500.00; Parcel No. 2, $1,000.00; Parcel No. 3, $2,000.00. The state in its reply denied that Parcel No. 1 had any value in excess of $2,500.00 and that Parcels No. 2 and 3 together had any value in excess of $1,500.00. The jury by its verdict assessed the market value of Parcel

No. 1 at $6,000.00 and of Parcels No. 2 and 3 combined at $1,500.00.

The state's brief contains 15 assignments of error, a number of them presenting the same point, namely, the propriety of the court's rulings which permitted the defendants to introduce evidence that the properties involved could be subdivided into a certain number of lots of certain dimensions to be used as sites for beach homes, and to show the prices at which such lots could have been sold on the day of the taking. The same legal question arises on exceptions to the court's charge.

The lands taken are parts of a larger tract formerly owned in its entirety by the defendants. Parcel No. 1 fronts on the Pacific Ocean. It is about 2400 feet long and varies in width roughly 30 feet at the north and 160 feet at the south. It includes a sandy beach. Its westerly boundary line is mean high tide, and its easterly boundary line before the taking was an abandoned railroad right of way 100 feet in width, granted by the predecessors in title of the defendants in 1918 and 1919 and which is included in the properties acquired by the state for the new highway. The remainder of the larger tract lies to the east of the railroad right of way; a considerable portion of this was platted in 1937 under the name of Beverly Beach, and most of the lots in this subdivision have been sold. The original plat of Beverly Beach, as prepared by the defendants, included Parcel No. 1 as Block 5 thereof, but when it was tendered for recording by the owners the county officials rejected it because the plat showed the railroad right of way running between the beach front property, Parcel No. 1, and the remainder of the land. The evidence of the defendants

indicates that they did not proceed with their purpose to plat Parcel No. 1 because of uncertainty as to whether or not the Highway Commission was going to take it. Mr. Deal testified that as early as 1937 he had received information from the Highway Department that this was the Commission's intention.

Parcels Nos. 2 and 3 are rectangular in shape and lie to the east of the old railroad right of way. Since the jury found that the combined value of these two parcels was in the exact amount conceded by the plaintiff no further consideration need be given them.

The plaintiff in its case in chief, for the purpose of showing that Parcel No. 1 was not adapted for subdivision purposes, introduced evidence that the property was too far from conveniences such as stores and a post office; that the cost of building a road to serve it would be very heavy; that it was not safe for home sites because it sloped sharply towards the beach and the ground was treacherous and likely to move and to wreck houses built upon it; that the northerly portion was too steep and narrow for subdivision purposes; and that, as one witness stated, "the amount of money that it would take to develop it would be prohibitive as to what you could receive after you platted it and attempt to sell it because you don't sell all of your lots the way you plat them." On cross-examination some of the state's witnesses were asked to give their opinions as to the probable value of lots into which the property might be subdivided, and, in response to such questions, placed very low, in some instances practically nominal, valuations on such nonexistent lots. One of the witnesses for the state conceded that it would be practicable to subdivide the south 1000 feet of Parcel No. 1, as the lots in that portion would be of adequate depth.

In an attempt to meet this testimony the defendants called as a witness Charles L. Marshall, a civil engineer who had first examined the property in 1936, having been employed to do so by the then owner of the railroad right of way, and who was at that time impressed with the suitability of Parcel No. 1 for subdivision purposes and so reported to his employers. He testified as follows:

"Q. [By Mr. Hart] Mr. Marshall, may I ask you, in your study of the property in October of 1946, did you consider what would be a feasible means of dividing Parcel No. 1 into lots?

"A. Yes.

"Q. Will you state what you had in mind in that respect?

"A. Well, I thought the property could be divided and should be divided into strips about 50 feet wide running from the right of way down to the beach and that it—

"MR. HALL: If the Court please, I want the record to show that we object to the question and that answer on the same ground as the previous objection that Counsel is not entitled to show that the tract of land is divided into specific lots. He may show that the highest and best use of the land is for subdivision purposes, but can go no further and cannot show the number of lots which they say that it can be divided into. I recite the citations.

"THE COURT: Same ruling.

"MR. HART: Proceed, Mr. Marshall.

"A. Of course, at the upper end where the property is narrow, it comes to a point at the north end, as far as usable the eastern, the 50 foot lot, would be impossible, but I would accept a 125 feet at the upper end into a lot and then 75 feet into another and when it became 70 or 75 feet from there south, cut that into 50 foot strips.

"Q.  And can you state the number of lots which you forsaw as feasible in Parcel No. 1?

"A.  In my opinion we could layout about 45 lots."

The witness further testified without objection to the probable costs of access roads and bringing water to the property, and gave it as his opinion that subdivision was entirely feasible from a financial standpoint.

Other witnesses called by the defendants likewise testified to the number and size of the lots into which Parcel No. 1 could have been subdivided, and in addition were permitted to express their opinions as to the prices for which such lots, had they existed, could have been sold in March, 1946. All this testimony came in over the objections of the plaintiff, and the court's rulings admitting it, as well as the testimony of Marshall which we have quoted, are the subject of the first four assignments of error.

Plaintiff contends that evidence of the number and value of non-existent lots is speculative and therefore inadmissible. That such is the general rule is established by many court decisions and authoritative text writers. We quote from 2 Lewis, Eminent Domain (3d ed.):

"The market value of property includes its value for any use to which it may be put. If, by reason of its surroundings, or its natural advantages, or its artificial improvements, or its intrinsic character, it is peculiarly adapted to some particular use, all the circumstances which make up this adaptability may be shown, and the fact of such adaptation may be taken into consideration in estimating the compensation. Some of the cases hold that its value for a particular use may be proved, but the proper inquiry is, what is its market value

in view of any use to which it may be applied and of all the uses to which it is adapted?" 1233, § 707.

"* * * It is proper to show that the property is suitable for division into village lots and that it is valuable for that purpose, but it is not proper to show the number and value of such lots as separate parcels." 1236, § 707.

"* * * In a case in Wisconsin it was held proper to show that property was suitable for division into village lots and the probable value of such lots. But this is clearly going one step too far. The probable value of village lots which do not exist is too speculative." 1241, § 709.

The matter is thus stated in 2 Nichols on Eminent Domain (2d ed.) 1170, § 445:

"Evidence of the value of the property for any use to which it is reasonably adapted, is, as already stated, admissible, but such evidence must be limited to a bare statement why the property is adapted for a particular purpose and to testimony of its value for such purpose. As bearing upon these issues the owner may offer a plan showing a possible scheme of development for the purpose for which it is most available, but he cannot go further and describe in detail to the jury a speculative enterprise for which in his opinion or that of some expert the land might be used, and base his estimate of value upon the profits which he would expect to derive from the enterprise. *The owner cannot for example introduce evidence of the return that he would derive from cutting up a vacant tract of land into building lots, since this would involve pure conjecture as to how fast the lots would be sold and the price that each would bring; and the details of a possible improvement of the land, and its value, or the expected profits or rentals after such improvement was completed are equally inadmissible, for the same reason.* The trial court cannot be too careful in excluding evidence of this

character, as witnesses can always be found who will, in their imagination, cover the most hopelessly unmarketable vacant land in the neighborhood of a large city with apartment houses filled with desirable tenants, and, with the aid of a little figuring, capitalize the prospective net income at ten times the actual value of the land * * *. Such evidence does not tend to show market value, since it utterly disregards the fact that hundreds of acres of land upon which the same development could be equally well undertaken can be bought at prices determined by cold and unimaginative bargaining between seller and buyer and the immutable laws of supply and demand; but it sometimes misleads the jury and the only safe course for the court is to exclude it altogether." [Italics added.]

The following decisions and many others support these views: *Sacramento Southern R. Co. v. Heilbron,* 156 Cal. 408, 104 P. 979; *People v. Olsen,* 109 Cal. App. 523, 293 P. 645; *Forest Preserve District v. Wing,* 305 Ill. 194, 137 N.E. 139; *Everett v. The Union Pacific R. Co.,* 59 Ia. 243, 13 N.W. 109; *Kansas City & T. R. Co. v. Vickroy,* 46 Kan. 248, 26 P. 698; *Manda v. City of Orange,* 82 N.J.L. 686, 82 A. 869, Ann. Cas. 1913D 581; *In re Daly,* 45 N.Y.S. 785; *Penn. S. V. R. Co. v. Cleary,* 125 Pa. St. 442, 17 A. 468, 11 Am. St. Rep. 913. See, also, 18 Am. Jur., Eminent Domain, §§ 244, 347; 20 C. J., Eminent Domain, 774, § 229; 29 C.J.S., Eminent Domain, 1027, § 160, 1264, 1265, § 273.

Among the few decisions to the contrary, counsel for defendants call our attention to *United States v. Waterhouse,* 132 F. 2d 699 (9th Cir. 1943), aff'd without opinion by equally divided court, 321 U.S. 743, 64 S.Ct. 484, 88 L.ed. 1047, in which witnesses arrived at the value of lands previously devoted to agricultural purposes by capitalizing at a certain rate of interest

rentals which they estimated could be obtained from lots into which the property taken might be subdivided. Admission of this evidence was approved by the United States Court of Appeals on the authority of *Olson v. United States,* 292 U.S. 246, 54 S.Ct. 704, 78 L.ed. 1236, which, however, did not involve the question now under consideration. The opinion in the Waterhouse case does not discuss the speculative character of such evidence, nor refer to the decisions upon that question. The decision stands almost alone, and its value as authority is not enhanced by the fact that the Supreme Court of the United States affirmed it without opinion by a vote of four to four.

Another case relied on by the defendants is *In re Inwood Hill Park,* 243 N.Y.S. 63, aff'd 256 N.Y. 556, 177 N.E. 138. The court held in that case that, upon the issue of the availability of certain property in the city of New York for apartment house purposes, it was error to exclude from the evidence "maps of proposed streets and subsurface improvements and evidence of the cost of constructing the same, also topographical maps showing existing grades and necessary changes of grade in connection with the proposed new streets." The evidence was objected to because the improvements did not exist and the maps had not been approved by the city. There was no attempt to show the number, size and selling prices of lots into which the property might be subdivided. The case goes no further than to hold that, where the issue of adaptability for subdivision is tendered, evidence is admissible for the purpose of showing the physical possibility of subdivision together with its attendant cost.

■ In the recent case of *State v. Cerruti,* 188 Or. 103, 214 P. 2d 346, we declined to countenance the admission

of evidence of speculative profits upon the issue of the market value of agricultural lands. The evidence here challenged is even more objectionable. The reasons for excluding it are admirably summarized in the passage we have quoted from Nichols. We adhere to the rule as there stated and as applied in the numerous decisions of the courts.

It should be recognized, however, that evidence which is speculative in one situation may not be so in another. Thus, in *County of Blue Earth v. St. Paul & Sioux City R. Co.*, 28 Minn. 503, 11 N.W. 73, the court, per Mitchell, J., held it proper for witnesses on value to adopt as a basis for their calculations the process of dividing the land into lots for residence purposes and then calculating the market value of the property by lots. But the land in that case was city property, in fact the court house square, while here we are dealing with a remote strip of wild land on the Oregon coast. Cf. *Catlin v. North. Coal & Iron Co.*, 225 Pa. 262, 266, 267, 74 A. 56.

Counsel for the defendants, early in the trial of the instant case, took the position that evidence which they now defend was not admissible when they objected to the following question put to the state's witness, Herbert Gordon: "Well, now, in your opinion, if a subdivider went in there to subdivide that, would it be a financial success?" The objection, based on the ground that the evidence would be speculative, was sustained by the court.

It is now argued, however, that the state, by its evidence, tendered the issue that Parcel No. 1 could not profitably be subdivided, and that, while, as counsel for the defendants concede, the law excludes evidence of the number, size and value of nonexistent lots

"on the issue of the fair market value of the tract", such evidence is admissible on the issue of the suitability of a tract for subdivision purposes. And it is urged that the expert witnesses for the defendants did not base their opinions of market value upon the sum of the values of the proposed lots less the expense of the proposed improvements, but testified to the market value of the tract, having in view its suitability for subdivision into lots to be used as home sites. Counsel cencede that the opinions of the courts do not express any such suggested limitation on the rule of admissibility, but say that it is fair "to assume that each of the courts meant to be dealing only with the issue before them."

In a condemnation case of this kind there is only one issue for the jury and that is the fair cash market value of the property taken at the time of the taking. On that issue it is competent to show that the land is available for subdivision. "If, by reason of its surroundings, or its natural advantages, * * * or its intrinsic character, it is peculiarly adapted to some particular use, all the circumstances which make up this adaptability may be shown, and the fact of such adaptation may be taken into consideration in estimating the compensation." 2 Lewis, Eminent Domain (3d ed), supra. An expert's estimate or guess as to how much non-existent lots of a proposed subdivision will sell for is not, as we read the authorities, one of the circumstances thus to be taken into consideration; and we can find nothing in the opinions to justify counsel's assumption of a limitation on the rule of admissibility. The evidence is speculative, no matter under what guise it is offered, and is not to be received at all because of its tendency to mislead the jury.

■  But here we have a case in which a witness for the state testified in effect that subdivision of the land was not feasible because the cost of the improvement would be too great in comparison to the selling price of the lots. The defendants certainly were entitled to contradict that testimony as long as it remained in the record, and the only way for them to do it, or at least the most effective way, was by evidence as to that cost and the testimony of their experts, speculative though it may have been, as to the probable selling value of the non-existent lots. We wish to make it clear that the defendants, by cross-examining some of the witnesses for the plaintiff on the selling price of the lots, could not themselves open up the case for the admission of such evidence. But its admission for the sole purpose of meeting the direct testimony of the state's witness to which we have referred would not be in itself ground for reversal. Since, however, that evidence was concededly admitted for a particular purpose, the court should have been very careful in its instructions to confine the jury, in its consideration of such evidence, to that purpose. We are thus brought to plaintiff's Assignment of Error No. VIII, which is based upon the court's refusal to give in its entirety the following instruction requested by the plaintiff:

> "I instruct you that in determining the fair cash market value of the real property described in the complaint as Parcel No. 1, should you find from the evidence that the highest and best use of Parcel No. 1 is for subdivision purposes then Parcel No. 1 may be valued according to its use for subdivision purposes, *but in no event, in determining the fair cash market value of Parcel No. 1 shall you consider the number of lots that Parcel No. 1 might be divided into or the value of such lots as separate parcels.*"

The court refused to give the part of the foregoing requested instruction which we have italicized.

The plaintiff contends that this was error, and the defendants concede in their brief that the language omitted "was a correct statement of the law and it may be that it could properly have been included in the instructions." They argue, however, that the court had a discretion not to include it because no one during the trial had ever claimed or suggested that the jury might value the land by the method stated in the requested instruction. With this argument we find ourselves unable to agree, for the reason that no one during the trial ever suggested—in the presence of the jury at least—that the evidence was offered and received for a particular limited purpose, and, so far as the instructions of the court were concerned, either at the time that the evidence came in or in the charge at the conclusion of the case, the jury were left entirely free to find the market value of Parcel No. 1 by doing the very thing which the rejected instruction would have told them not to do. It is true, as counsel say, that the defendants did not claim that Parcel No. 1 had ever been subdivided. But we look in vain for any statement in the record by counsel that the evidence of values of the potential lots was offered for a limited purpose or by the court that it was admitted for such purpose. Nor did the affirmative instruction by which the court advised the jury that, on the issue of suitability for subdivision, they might consider this evidence suffice to compensate for the error in refusing to instruct that it might not be considered for any other purpose; for, when evidence is competent for one purpose but incompetent for another, it is error if the court refuses to limit the evidence to the

purpose for which it is competent. *State v. Moore,* 180 Or. 502, 507, 176 P. 2d 631, 177 P. 2d 413; *State v. Farnam,* 82 Or. 211, 253, 161 P. 417, Ann. Cas. 1918A 318; *State v. Finnigan,* 81 Or. 538, 544, 160 P. 370; 53 Am. Jur., Trial, 515 § 670. And, as we cannot say that the error did not influence the verdict, the judgment must be reversed. *State v. Cerruti,* supra, 188 Or. 116.

The plaintiff excepted to the giving of the following instructions:

"I instruct you that the owners of Parcel 1 on March 23, 1946, were entitled to pursue by proper proceedings what the law calls an 'easement of necessity' over and across the railroad right of way giving them access to and from Parcel 1."

The plaintiff further excepted to the court's refusal to give its requested instruction on the same subject reading as follows:

"I instruct you that in your determination of the fair cash market value of the real property described in the complaint as Parcel No. 1, you may take into consideration that the defendants have no right of access and no right of ingress or egress to or from Parcel No. 1 and the old railroad right of way lying adjacent and to the east of Parcel No. 1, and that the defendants have no easement, permit or any other right of crossing over the old railroad right of way from Parcel No. 1 to any public highway or other property lying east of Parcel No. 1."

These rulings are made the basis of Assignment of Error No. XIII.

The parties stipulated that Parcel No. 1 lies in Government Lots No. 1 and 2 of Section 8, Township 10 South, Range 11 West of the Willamette Meridian; that in 1919 a predecessor in title of the defendants who owned all of Government Lot 1 granted that part of the right of way which lies in Government Lot 1,

and that in 1918 a predecessor in title of the defendants who owned all of Government Lot 2 granted that part of the right of way which lies in Government Lot 2. These grants were by deeds of conveyance, but the deeds were not introduced in evidence. The parties further stipulated that there was no instrument of record which granted a right to use the railroad right of way as a crossing. An instruction embodying this part of the stipulation was given to the jury. In 1936 the defendants acquired the title to the entire property except the railroad right of way. In 1937 the state, through the State Highway Commission, purchased the railroad right of way from its then owner, receiving a deed of conveyance in fee simple.

The instruction excepted to is ambiguous, but was probably taken by the jury to mean that the defendants, by appropriate court proceedings, were entitled to establish an easement of way of necessity over the railroad right of way. So considered, it was erroneous for reasons presently to be stated.

The defendants assert as a proposition of law that "Where a railroad right of way separates one part of a tract of land from another, and particularly where one such part is thereby isolated, a way of necessity for a private crossing over the right of way is reserved by legal implication", and cite the following cases: *Cleveland, C. C. & St. L. Ry. Co. v. Smith*, 177 Ind. 524, 97 N.E. 164; *New York Central R. Co. v. Yarian*, 219, Ind. 477, 39 N.E. 2d 604; *Kirk v. Kansas City S. & G. Ry. Co.*, 51 La. Ann. 664, 25 So. 463; *New York & N. E. R. Co. v. Board of Railroad Commissioners*, 162 Mass. 81, 38 N.E. 27; *Heaton v. New York C. & H. R. R. Co.*, 149 N.Y.S. 71; *Gulf, C. & S. F. Ry. Co. v. Rowland*, 70 Tex. 298, 7 S.W. 718; *Miller v. Seaboard*

*Air Line Ry. Co.,* 94 S.C. 105, 77 S.E. 748. Except for the Louisiana case of *Kirk v. Kansas City S. & G. Ry. Co.,* supra, the decisions relied upon do not support the defendants' broadly stated rule. The other cases, with the exception of *Miller v. Seaboard Air Line Ry. Co.,* supra, recognize that the ordinary rules governing ways of necessity apply in the cases of the grant of a railroad right of way, and in particular that the right does not arise if there is other means of access to the property of the one claiming the easement. In the Miller case the railroad company had acquired by condemnation a right of way through plaintiff's farm and constructed its road so as to divide his tract of land into two parts. The decision turned on the right of the plaintiff to use a crossing which the railway company had put in, and the court held that, as the plaintiff was the owner of the fee in the land, and the defendant had all that it could acquire by condemnation, to wit, the right to make such use of the land as was necessary for railroad purposes, the plaintiff "had the right to cross the railroad *on his own land* wherever he saw fit to do so, provided, he did not interfere with the right of the railroad to use its right of way for railroad purposes." [Italics added.] 94 S.C. 108. The clear distinction between that case and the case at bar is that here the railway company acquired the fee, and not merely the right to use the land for railroad purposes. We may observe in passing that *Beck v. Lane County,* 141 Or. 580, 18 P. 2d 594, involved the question of the right to an easement over a railroad right of way, but there the right had been expressly reserved by the grantor.

■ We think the question here is governed by the usual rules of law applicable where an easement of

necessity is claimed. The defendants had the burden of proving the implied easement, including the duty of showing that they had no other practicable way of ingress and egress than by crossing the railroad right of way. 17 Am. Jur., Easements, 967, § 54; 28 C.J.S., Easements, 734, 738, § 68; 19 C.J., Easements, 958, § 181, 960, § 182. This burden the defendants failed to carry because they introduced no evidence whatever that Parcel No. 1 was cut off on the north or on the south. Hence, as we have said, the instruction complained of was erroneous; but this defect in the proof may be supplied on another trial.

The plaintiff, on its part, contends that we should rule as matter of law that defendants were not entitled to the claimed way of necessity because they have access to Parcel No. 1 by the ocean and by the beach, which is a public highway. § 100-1001, O.C.L.A.; Ch. 493, Oregon Laws, 1947.

This court has *arguendo* recognized the general rule that ''Ordinarily no right of way by necessity exists where the land to which such right of way is claimed borders on the sea.'' *Tucker v. Nuding,* 92 Or. 319, 180 P. 903. It has not, however, so far as we can ascertain, been called upon heretofore to apply the rule. Cases in which the question has arisen are collected in the annotation to *Littlefield v. Hubbard,* 124 Me. 299, 128 A. 285, 38 A.L.R. 1306, 1310. Without stopping to analyze them, it will suffice to say that they do not announce a doctrine of uniform application. To illustrate: in *Kingsley v. Gouldsborough Land Improvement Co.,* 86 Me. 279, 29 A. 1074, 25 L.R.A. 502, it appeared that the land to which the way of necessity was claimed was surrounded on three sides by navigable water, that the owners had built a

wharf and in the summer were accustomed regularly to run a steamboat two or three times a day between the premises and other places. It was held that there was no way of necessity over the adjacent land. On the other hand, in *Rodal v. Crawford*, 272 Mich. 99, 261 N.W. 260, the court held, one judge dissenting, that the navigable water rule should not be applied to the use of water which is frozen and may not be navigated except by large vessels during a number of months in each year. And in *Feoffees of the Grammar School in Ipswich v. Proprietors of Jeffrey's Neck Pasture*, 174 Mass. 572, 55 N.E. 462, the court ruled that where the way by water was not available for general purposes to meet the requirements of the uses to which the plaintiff's property would naturally be put, a way of necessity might be acquired. See 28 C.J.S., Easements, 699, § 35; 17 Am. Jur., Easements, 966, § 53.

■ In this case we think it would be highly unreasonable to say that the owners of what is now Parcel No. 1 were precluded from acquiring a way of necessity over the railroad right of way because they might have been able to reach their property by putting a small boat through the surf on the Oregon coast—an undertaking at all times perilous, and at some suicidal. We so hold as matter of law.

■ These considerations apply, though in somewhat lesser degree, to the plaintiff's contention based on the fact that the beach is by statute a public highway. There is no evidence about the character of the particular beach, other than that it is sandy. We know judicially, however, that travel by automobile is impossible on many Oregon beaches at high tide, so that throughout the year, and particularly in the winter

season of extreme high tides, there would be a certain number of hours of the day when access to the property over the beach by automobile would be cut off. It is true that there are many cases holding that "a grantor cannot have a way of necessity over lands granted if he has another mode of access to his remaining lands however inconvenient." 17 Am. Jur., Easements, 964, § 50. See *Tucker v. Nuding,* supra. But in *Rose v. Denn,* 188 Or. 1, 212 P. 2d 1077, 213 P. 2d 810, we approved the following expression of this principle from the Restatement, Property, P. 2984: "If the necessity of an easement is such that without it the land cannot be *effectively* used, nothing less than explicit language in the conveyance negating the creation of the easement will prevent its implication." [Italics added.] And, as illustrated by the Feoffees case from Massachusetts to which we have referred, a factor in the problem is whether the way claimed to be adequate is available for general purposes to meet the requirements of the uses to which the property would naturally be put. There is abundant proof in this case that the only use to which Parcel No. 1 could have been put before it was condemned was as a site for beach homes, and a reasonable conclusion could be drawn that no such use would be possible where access to the tract by automobile was cut off a large part of the time. That today is the normal mode of private transportation on land—and it might be found that in a locality such as that with which we are here concerned, it is, in fact, for practical purposes, the only mode, and that this was true at the time the railroad right of way was created. "What constitutes an easement or a right thereto is a question of law, but whether the facts necessary to the existence of the right have been proved

is a question of fact for the jury." 28 C.J.S., Easements, 748, § 71; 19 C.J., Easements, 965, § 199. In view of the conditions to which we have referred and the applicable rules of law, we think it would be a question for the jury to determine whether, notwithstanding the beach is a public highway, there existed such a degree of necessity for the use of the railroad right of way as a means of access to Parcel No. 1 as to justify the implication that the right to such use, or way of necessity, was reserved in the grantors, the predecessors in title of the defendants.

We have discussed this question on the basis on which it has been presented by the parties. It may be, as suggested in the defendants' brief, that when the state acquired title to the railroad right of way in 1937 it became open to the public. The evidence, however, does not appear to have been directed to that issue, and, in the absence of argument, we have hesitated to express an opinion about it. On another trial the matter may become sufficiently clear so that the question of a way of necessity will drop out of the case.

■ We find no merit in any of the remaining assignments of error except Assignment XV, which presents the important question whether the defendants are entitled to interest on the amount of the verdict from the time of the taking of the land by the state. The question did not arise until after the verdict had been returned and the jury discharged. Then, upon motion of the defendants, the court entered judgment for them in the sum of $7,500.00, the amount of the verdict, together with interest thereon at the rate of 6% per annum from March 23, 1946, the date of the commencement of the action and of the taking. The plain-

tiff says that in thus amending the verdict the court exceeded its authority, and in that we agree. The point is settled by our holding in *Printing Industry v. Banks,* 150 Or. 554, 46 P. 2d 596, which expressly overruled what was said to the contrary in *Hill v. Wilson,* 123 Or. 193, 261 P. 422, and reestablished the doctrine of *Fiore v. Ladd,* 29 Or. 528, 46 P. 144, that when ''a verdict has been returned by a jury which expresses their intention, and they have been discharged, the court is powerless to amend it, however erroneous it may be. It must either enter a judgment thereon, or set it aside and grant a new trial.''

But, since the substantive question will arise on another trial, we deem it expedient, for the guidance of court and counsel in this and future cases, to express our views.

Article I, § 18, of the Constitution of the State of Oregon, provides in part as follows: ''Private property shall not be taken for public use  *  *  *  without just compensation.'' The Fifth Amendment to the Constitution of the United States contains substantially the same provision, ''nor shall private property be taken for public use, without just compensation.'' In construing this identical language of the Federal Constitution the Supreme Court of the United States holds as follows: ''It is settled by the decisions of this Court that just compensation is the value of the property taken at the time of the taking (citing cases). And, if the taking precedes the payment of compensation, the owner is entitled to such addition to the value at the time of the taking as will produce the full equivalent of such value paid contemporaneously. Interest at a proper rate is a good measure of the amount to be added.'' *Brooks-Scanlon Corp. v.*

*United States,* 265 U.S. 106, 123, 44 S.Ct. 471, 68 L.ed. 934. See to the same effect *Seaboard Air Line Ry. Co. v. United States,* 261 U.S. 299, 306, 43 S.Ct. 354, 67 L.ed. 664; *United States v. Benedict,* 261 U.S. 294, 298, 43 S.Ct. 357, 67 L.ed. 662; *Brown v. United States,* 263 U.S. 78, 84–88, 44 S.Ct. 92, 68 L.ed. 171; *United States v. Rogers,* 255 U.S. 163, 41 S.Ct. 281, 65 L.ed. 566; *United States v. Thayer-West Point Hotel Co.,* 329 U.S. 585, 67 S.Ct. 398, 91 L.ed. 521. In these cases and others the proper rate of interest is held to be the legal rate prevailing in the jurisdiction where the land is located. The Supreme Court of West Virginia holds on the authority of these decisions and also of *Dohany v. Rogers,* 281 U.S. 362, 50 S.Ct. 299, 74 L.ed. 904, 68 A.L.R. 434, that denial of the right to interest would be a violation of the Fourteenth Amendment to the Federal Constitution. *Simms v. Dillon,* 119 W. Va. 284, 193 S.E. 331. The following texts are authority for the allowance of such interest as part of the damages sustained by the owner of the land. 1 Nichols on Eminent Domain (2d ed.) 653, § 216; 2 Lewis, Eminent Domain (3d ed.) 1320, § 742; 18 Am. Jur., Eminent Domain, § 272.

■ We see no need for extended discussion of the question. We adopt the construction of the words ''just compensation'' in our Constitution which has been placed upon the same words in the Federal Constitution by the highest court in the land, and hold as matter of law that the defendants are entitled to interest at the rate of 6% per annum from the day of the taking on whatever sum the jury may find to be the fair market value of the property, such interest to be deemed a part of the damages suffered by the defendants as a result of the appropriation.

There has been argument as to the procedure, the plaintiff contending that interest cannot be recovered in any event unless demanded in the defendants' answer. The defendants say that, since interest is a part of just compensation under the Constitution and they are entitled to it as a matter of right, it would have been the duty of the court to allow it even though they had made no appearance whatever, citing 2 Nichols on Eminent Domain (2d ed.) 1080, § 407; 18 Am. Jur., Eminent Domain, 970, § 326.

Our statute governing the procedure in condemnation by the state when acting through the State Highway Commission, provides that, "except as otherwise provided herein such action or proceeding shall be commenced and prosecuted to final determination in the same manner as an action at law." It contains provisions as to the contents of the complaint and that "The defendant in his answer may set forth any legal defense he may have to the appropriation of such lands, or any portion thereof, and may also allege the true value of the real property and the damage resulting from the appropriation thereof." § 100-116, O.C.L.A., as amended by Ch. 283, Oregon Laws, 1947.

This legislation contemplates clearly the appearance by the defendants, the filing of pleadings and a trial as in actions at law. An orderly procedure under such a statute would indicate the propriety of the defendants alleging all the damages which they claim; and, while we are not prepared to say that the defendants would waive their claim to interest should they fail to plead it, we think it would be at least their duty to call the matter to the attention of the court and request an instruction upon it, so that the jury shall by their verdict find the fair cash market value

of the land plus interest thereon at the legal rate from the day of the taking. Since the defendants will have ample opportunity to amend their answer before another trial by including a claim for interest, we think it unnecessary to go further into the subject at this time.

For the errors pointed out the judgment is reversed and the cause remanded to the Circuit Court for further proceedings in conformity to this opinion.