Argued and submitted March 9, affirmed December 16, 1998

STATE OF OREGON,
by and through its
Department of Transportation,
*Respondent,*

*v.*

EL DORADO PROPERTIES,
a California partnership comprised of
Walker Smith, Jr., Alexander M. Power,
Ervin E. Yoder, Jr., and V. J. Shrader,
also known as Varney J. Shrader,
who took title as V. J. Shrader,
*Appellant.*

(94-CV-0461-AB; CA A94124)

971 P2d 481

Neil R. Bryant and Donald Joe Willis argued the cause for appellant. With them on the briefs were John D. Sorlie and Bryant, Lovlien & Jarvis and Peter A. Ozanne and Schwabe, Williamson & Wyatt.

Jas. Adams, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Haselton, Judges.

WARREN, P. J.

## WARREN, P. J.

Defendant, a California partnership, appeals from the judgment in this condemnation case, asserting that various rulings of the trial court prevented it from presenting evidence that was essential to determining the value of the property. We affirm.

At the time of the taking, defendant owned both the Bend River Mall along Highway 97 in the northern portion of Bend and an additional 14 acres of undeveloped land that was located between the mall on the west and the Burlington Northern Santa Fe railroad tracks on the east. The mall fronts on the east side of Highway 97; the mall buildings run along the western boundary of the undeveloped property, at least partially blocking the view of the property from the highway. Most of the undeveloped 14 acres are moderately undulating in character, although a portion is 10 to 12 feet higher than the rest. The Swalley Irrigation District canal runs a little below the surface of the property through an aluminum pipe. At the time of the taking, Division Street, a dedicated and platted but unbuilt street, also ran through the property in a different location. The property is zoned highway-commercial. Before the taking, defendant had worked on several possible plans for developing the 14 acres, none of which had gone beyond the talking stage.

Plaintiff condemned 7.29 of the 14 acres in order to construct the Bend Parkway, which generally follows the route of the unbuilt Division Street through the property; 6.71 acres remain in defendant's ownership. Most of the taken land was between Division Street and the railroad tracks, but a portion was west of Division Street. In its original complaint, plaintiff alleged that the value of the condemned property was $740,000. It paid that amount into court in order to take immediate possession; defendant withdrew the money shortly afterwards. Plaintiff subsequently reevaluated the property and, 10 days before trial, filed an amended complaint alleging that it was worth $488,000. The jury found the value to be $508.083.20. As a result, the judgment requires defendant to refund the state $231,916.80, the difference between what defendant received and the jury's determination of the property's value.

The primary issue at trial was the kind of use for which the condemned land would be suited without the creation of the Bend Parkway. Defendant's theory was that the land was highly valuable, either for an addition to the existing mall or for other commercial uses, including a variety of large retail stores. It presented considerable evidence that commercial development was the highest and best use of the land and that the existing mall would provide significant benefits for commercial development on the property. Defendant's appraiser specifically referred to the possibility of attracting a national chain superstore to the site. On the other hand, plaintiff's evidence indicated that there were a number of problems with using the property for that purpose. The problems that plaintiff identified included the irrigation canal and the unbuilt Division Street, each of which limited where buildings and other improvements could go; the property's location away from the highway and the buildings in the existing mall, both of which limited the visibility of the property to motorists; and the character of the land, including the portion that was higher than the rest, which might make it more expensive than usual to prepare the site for development. Brainerd, one of plaintiff's appraisers, also suggested that defendant's failure to obtain a lease with a large national chain or superstore, despite discussions with several, showed that the property was not suited for that use. Most of the issues on appeal relate to the limits that the trial court placed on defendant's attempts to respond to plaintiff's evidence.

In its first assignment of error, defendant attacks the court's refusal to admit evidence concerning its specific plans to develop the property for commercial use. Defendant argues that the plans showed that commercial development was possible, either by paving over the irrigation canal or by moving Division Street to a different location. Without that evidence, it says, "the jury could have concluded that no commercial complex could have been built on the subject property because of the physical limitations of the property and, therefore, the value of the property would be less than as testified to by defendant and its experts."

■■ A landowner is entitled to receive just compensation for land taken for a public use, based on the value of the land

at its highest and best use, which is the most profitable likely use of the property at the time of the taking. That likely use may include a program of future use of the land that represents its highest present land value. *Dept. of Trans. v. Lundberg*, 312 Or 568, 574, 825 P2d 641 (1992). Thus, evidence of uses to which the land is reasonably adapted is admissible, even if the land is not presently being used for those purposes. That includes evidence that at the time of the taking the land was being developed for a particular use. *Highway Com. v. Assembly of God et al*, 230 Or 167, 176, 368 P2d 937 (1962).

■ The essential requirement for evidence of a possible future use of the property, which is at issue here, is that the prospect of the use "is more than a speculative forecast and [that] the probability of such future use would be reflected in the value which a present purchaser would attach to the property." *State Highway Com. v. Arnold et al*, 218 Or 43, 57, 341 P2d 1089, 343 P2d 1113 (1959). Evidence that the land is adapted to a particular use may include a plan that shows a possible scheme of development, but the owner may not describe in detail a speculative enterprise for which the land might be used. *State Highway Com'n v. Deal et al*, 191 Or 661, 669, 233 P2d 242 (1951). In *Deal*, the Supreme Court held that the trial court erroneously admitted evidence that the land in question could have been divided into a specific number of beachfront lots of specific sizes. It agreed with the plaintiff that the number and value of nonexistent lots was speculative and therefore inadmissible. 191 Or at 668.

■ On appeal, defendant focuses on evidence that it presented in an offer of proof. That evidence included maps that a planner had prepared of two different possible configurations for developing the land, testimony related to those maps, and discussions of the possibility of either placing parking over the aluminum pipe that carries the Swalley irrigation canal or of moving Division Street over the canal. The proposed configurations called for one or the other of those things. In addition, Smith, one of defendant's partners, testified that two major departments stores had expressed an interest in locating on the property, that one of them would have done so if the Bend Parkway proposal had not affected the property that it intended to use, and that he had many

opportunities to lease property that was developed in the way that the two proposals suggested. None of those opportunities, however, had actually led to a lease with any store or other enterprise. In addition, some evidence in the offer of proof related to whether it was physically possible to build over the canal, while other evidence rebutted Brainerd's testimony that it was not economically feasible to build a large commercial development on the property.

Defendant presented all of this evidence in a single offer of proof, at the conclusion of which it moved for admission of the evidence as a unit. It did not separately seek the admission of any specific portion of the overall offer. Defendant assigns error to the court's ruling on the offer, in which the court stated:

> "The case law talks in terms of probability. And (inaudible)[1] to some of the facts (several words inaudible). What I concluded, based on the offer of proof, is that everything was in the potential stage and the possibility stage. The plans were in the first stage of development so (inaudible) two varieties of ideas of how to develop it. The possibility of moving Division Street, again that was a possibility, that was speculative as to whether or not that could occur.

> "The Swalley Irrigation District, the Irrigation District agreement does not specifically give permission to build something over it or necessarily even pave over it so once again, that's speculative in nature. So there is uncertainty as to whether or not either of the two developments, either [exhibit] 101 or [exhibit] 102, would come to fruition (inaudible) binding agreements. There wasn't even a tentative lease, and as a result I'm not going to allow any testimony regarding specific plans or developments for the parcel of land."

The court did state, however, that defendant could produce evidence of the *general* character, location, physical condition, and probable use of the land and what, in light of those

---

[1] This case was reported electronically rather than by a stenographic court reporter, with the result that the transcript is riddled with inaudible portions that could not be transcribed. Most of the inaudible portions are apparently only a word or two in length, but some appear to be longer. So far as we can tell, those defects have not affected our understanding of the case or our ability to decide the issues that the parties present.

circumstances, would be its highest and best use. It emphasized that it excluded specific plans, not evidence of the general purpose for which the land could be used.

In its argument on the first assignment of error, defendant concentrates on the evidence related to exhibits 101 and 102, which were two possible schemes of development that, as the court indicated, had never gone anywhere. It is difficult to see what that evidence would add to the other evidence that the property was adaptable to commercial uses. Rather, it is precisely the kind of speculative evidence that the Supreme Court has warned trial courts not to accept.

> " 'The trial court cannot be too careful in excluding evidence of this character, as witnesses can always be found who will, in their imagination, cover the most hopelessly unmarketable vacant land in the neighborhood of a large city with apartment houses filled with desirable tenants, and, with the aid of a little figuring, capitalize the prospective net income at ten times the actual value of the land.' " *Deal*, 191 Or at 669-70 (*quoting* 2 Nichols on Eminent Domain (2d ed) 1170, § 445).

Except that defendant's witnesses attempted to cover its land with commercial properties filled with desirable tenants rather than with apartment houses, this statement is not far from describing the nature of much of their proposed testimony. The trial court did not err in excluding it.

■ Portions of defendant's offer of proof, such as testimony that it was physically possible to build over the canal, may not be subject to this criticism, while other portions may, as defendant argues, be admissible to refute Brainerd's testimony that it was not economically feasible to build a large commercial establishment on the property. The court did not discuss those portions of the offer in its ruling, and it is not at all clear that it intended to exclude them. However, defendant neither sought to clarify the court's ruling in that regard nor to present that evidence to the jury. There may, thus, be no ruling of the court that it can challenge.

Even assuming that the court intended to reject that portion of the offer of proof, defendant did not move separately for admission of that specific evidence. "It is well established that when a single offer of proof contains both admissible and inadmissible matter, as in this case, it is not error to

reject the entire offer." *Pumpelly v. Reeves*, 273 Or 808, 812, 543 P2d 682 (1975); *see also Freedman v. Cholick et ux*, 233 Or 569, 576, 379 P2d 575 (1963); *State v. Thomas*, 149 Or App 557, 560-61, 945 P2d 1056 (1997); *State v. Howard*, 49 Or App 391, 397, 619 P2d 943 (1980). Thus, if the court rejected the proffered evidence, it did not err.[2]

■  We turn to plaintiff's claim of project enhancement. There was evidence that the announcement of the Bend Parkway project enhanced the value of the portion of the condemned property that was west of Division Street so that at the time of the taking it was worth more than it would have been without the prospect of the parkway. Although property taken for a public use is valued as of the date of the taking, any increase in the value that results from the planning, announcement, and construction of the project for which the property is taken is not part of the value for which the condemning authority must pay. *State Dept. of Trans. v. Montgomery Ward Dev.*, 79 Or App 457, 466, 719 P2d 507, *rev den* 301 Or 667 (1986). Defendants do not dispute that general rule, but they argue that Brainerd's testimony, on which plaintiff relies for showing project enhancement, was without a sufficient foundation.

In determining whether there was project enhancement in this case, Brainerd first estimated the value of the land before the announcement of the project in May 1989. He set that base value at $1 per square foot, primarily because that was the price that defendant had paid when it purchased the land in December 1988. After establishing the base value, Brainerd adjusted it to reflect trends in prices of commercial land in the area to the date of the taking. That adjustment produced a value of $1.70 per foot as of the taking. However, Brainerd also concluded that at the time of the taking the actual fair market value of the portion of the land west Division Street was $3 per foot. From that information

----

[2] It might be that defendant sufficiently preserved a claim of error to those portions of the offer of proof that the court expressly rejected, but, other than the testimony of Smith that we discuss below, none of them is involved in this appeal. Thus, the court expressly excluded evidence that an agreement with the Swalley Irrigation District permitted defendant to build over the canal, but on appeal defendant mentions only evidence that it was physically possible to build over the canal.

Brainerd concluded that the enhancement of that portion due to the announcement of the project was $1.30 per foot. He therefore deducted $1.30 per square foot of the enhanced portion of the condemned property from his appraisal of the total value in order to account for the project enhancement. That led him to place just compensation for the taking at approximately $488,000.

Defendant attacks that evidence on three grounds, each of which relates to Brainerd's estimation of base value as of May 1989. First, defendant argues that Brainerd could not determine the amount of project enhancement without first having established a base value for the property as of the announcement of the project and that the only way to do that was to make a formal appraisal as of that date. Second, it asserts that Brainerd could not use the December 1988 sale to establish the base value, because the court had excluded evidence of that sale on the issue of the value of the property in 1994. Finally, defendant appears to argue that Brainerd could not rely on a single sale in determining the value at that time. We consider those arguments in turn.

■ Defendant bases its argument that Brainerd had to make a full appraisal as of 1989 before he could determine the amount of project enhancement on the testimony of its own expert appraiser. That testimony was:

"Q. To use the enhancement theory is there a requirement that you do an appraisal of the property in the base year?

"A. Have to have some evidence of value in a base year. You can't just pull a number out of the sky."

Defendant's appraiser stated only that there had to be *some* foundation for the 1989 value, not that there had to be a full appraisal in 1989. Defendant, thus, relies on what it expected its appraiser to say, not on what he actually said. We know of no other ground for requiring a full appraisal as of 1989 in order to establish a base value for determining the amount of project enhancement.

■ Defendant also attacks Brainerd's use of the December 1988 sale as the evidence of the property's value in the base year. Before plaintiff's experts testified, the court

granted defendant's motion to exclude evidence of the price that it paid for the land. The court concluded that that sale was too remote in time to be relevant to the value of the land in October 1994, almost six years later. Before Brainerd testified concerning his opinion about project enhancement, he testified, in the absence of the jury, that he used the December 1988 sale to establish the value of the land in May 1989. The trial court, over defendant's objection, allowed him to use that base value, without explaining how he arrived at it, in his testimony to the jury. In its cross-examination, defendant did not ask about the source of the base value. Thus, the jury never learned of the 1988 sale price.

The trial court acted properly in this respect. That the December 1988 price was too remote to be relevant to the *October 1994* value does not mean that it was irrelevant to the *May 1989* value. Brainerd's project enhancement testimony required that he have some basis for estimating the May 1989 value, and it was reasonable for him to use the December 1988 sale for that limited purpose. He did so in a way that was consistent with the trial court's decision to exclude the price for the December 1988 sale from the jury's consideration.

■   Defendant also argues that, at the times involved in this case, various statutes and administrative rules governing licensed appraisers required them to make appraisals in writing if they involve the "preparation, completion, and issuance of an opinion" as to the value of property at a particular time. *See* ORS 674.020 (1995); ORS 674.100(1)(b) (quotation); OAR 161-25-060(5).[3] What defendant fails to recognize is that the purpose of Brainerd's appraisal was to determine just compensation *at the time of the taking*. Determining a base value for the property in May 1989 was simply part of determining the appraised value in October 1994 as affected by project enhancement. In that respect it is no different from applying trends in property values to determine the relevance of a comparable sale that occurred some time

---

[3] ORS 674.020 was amended in 1997, among other things by deleting the express requirement of written appraisals. Or Laws 1997, ch 417, § 1. OAR 161-25-060(5) has since been renumbered as OAR 161-025-0060(5).

before or after the taking to the value of the condemned property at the time of the taking. In either situation, the appraiser considers the value of various properties at various times as part of determining the value of the subject property at the time of the appraisal, which is the only thing on which the appraiser prepares, completes, and issues an opinion.

■ Defendant's final point is that Brainerd could not rely on a single sale as showing the value of the property at the time of the announcement. He seems to rely for that point on *Highway Commission v. Fisch-Or*, 241 Or 412, 399 P2d 1011, 406 P2d 539 (1965), in which the Supreme Court held that hearsay evidence of comparable sales is admissible to explain the basis of an appraiser's opinion of the property's value but not as substantive evidence of the price at which the comparable properties sold. However, the issue in this case is not using comparable sales to determine the value of the condemned property. Rather, it is using an actual sale of the condemned property itself to determine the value of that specific property near the time of the sale. Defendant, a willing buyer, purchased the property in an arm's-length transaction from a willing seller. That sale was sufficient evidence of the value of the property at the time for Brainerd to use it to establish the base value from which he measured the enhancement. For the same reason, the court did not err by instructing the jury on project enhancement.

■ Defendant next challenges the court's refusal to admit into evidence plaintiff's original complaint, in which plaintiff alleged that just compensation for the property was $740,000. It asserts that the original complaint was an admission and that having it in evidence would permit the jury to learn of what defendant describes as plaintiff's "nefarious conduct" in reducing its original statement of the property's value shortly before trial. There was testimony that Brainerd had originally appraised the property at $740,000[4] and had then reduced that amount after one of plaintiff's attorneys suggested that he determine whether there was any project enhancement. Defendant called plaintiff's project

---

[4] There is no dispute that the $740,000 amount was, in fact, a little too high. A subsequent survey slightly reduced the size of the condemned property, thus reducing its value proportionately.

manager as its own witness, primarily to discuss plaintiff's review of the value of the property before plaintiff filed its original complaint. Part of that testimony was:

> "Q. Did you do that review [of the fairness of the appraisal] prior to the complaint being filed in this case? That said the just compensation was $740,000?
>
> "A. I don't have the dates and when that was done, but yes."

■ The trial court refused to admit the original complaint because it would be cumulative of that testimony. It did not abuse its discretion in doing so, because the jury already knew what defendant sought to prove through the admission of the complaint. *See Myers v. Cessna Aircraft*, 275 Or 501, 518-19, 553 P2d 355 (1976) (court did not err in excluding exhibit offered at end of trial that was cumulative of deposition previously admitted). In addition, we see nothing "nefarious," or even questionable, in plaintiff's actions. Defendant is entitled to no more than just compensation. When plaintiff came to believe that its original estimate of value was too high, it was entirely appropriate for it to amend its complaint to reflect that new evaluation. *See Montgomery Ward Dev.*, 79 Or App at 462-64. Any other course could lead to defendant receiving a windfall at public expense.

■ Defendant next assigns error to the trial court's refusal to permit Smith to testify to the value of the property based on projected rental income from prospective tenants in a proposed commercial development of the property. It points to the general rule that an owner may always testify about the value of property without demonstrating special knowledge, skill, or training, even if the owner has little knowledge of the value of the property. *See Edwards v. Uncle Don's Mobile City*, 273 Or 746, 751, 543 P2d 4 (1975); *Lunda v. Matthews*, 46 Or App 701, 709-10, 613 P2d 63 (1980). Even assuming that a partner of a partnership that owns the condemned land comes within this rule, *but see Assembly of God*, 230 Or at 177 (testimony of president of corporation does not qualify as testimony of owner of condemned land), the trial court did not err.[5]

---

[5] This evidence was included as part of defendant's offer of proof. Although defendant did not offer the evidence separately from the rest of the offer, the court

The rule that the owner of property may testify to its value has little if anything to do with the owner's expertise in appraising property. It may be that the owner is disqualified if the owner has *no* knowledge of the market value of the property. *See Lunda*, 46 Or App at 710. However, despite their scepticism about the wisdom of permitting an owner to testify with no other foundation than the fact of ownership, *see Freedman*, 233 Or at 577, Oregon courts have never actually disqualified an owner on that ground. "The competency of an owner to testify as to the market value of his own property is not conditioned upon his knowledge of the market value of other similar property in the vicinity." *Lewis v. Worldwide Imports, Inc.*, 238 Or 580, 584, 395 P2d 922 (1964). The owner, that is, is not qualified as an expert, nor is the owner's testimony the evidence of an expert. The owner simply testifies, and that testimony is sufficient to support an award of damages. *See Lunda*, 46 Or App at 709-10.

■    The difficulty in this case is that Smith did not propose simply to give his opinion of the property's value. Rather, he proposed to base that opinion on his view of the income that the property could produce once it was developed. Smith would have testified that, under that approach, the property was worth $3.62 a foot. After the court rejected that evidence he in fact testified that, based on a comparable sales approach, the property was worth $3.50 a foot. Although Smith testified concerning his experience in the real estate business, defendant did not attempt to qualify him as an expert on property values.

In essence, what defendant proposed was to use the testimony of Smith in a way that would allow him to present a theory of value that the court had properly excluded. No case permits that action. In most cases involving owner testimony, the owner simply testifies to his or her opinion. In the few cases where the testimony went beyond that minimum, the decisions suggest that the same limitations apply to owner testimony that apply to other evidence of value. In *Highway Commission v. Dumas*, 238 Or 449, 395 P2d 424 (1964), the plaintiff showed on cross-examination that the

expressly ruled on it and defendant assigns error to that ruling. We will therefore consider the merits of this assignment of error.

owner based his testimony in part on an irrelevant factor that made his estimate too high by $5,000. The plaintiff then moved to strike $5,000 from the owner's statement of value. The Supreme Court, after noting that it is proper to strike the *entire* testimony of a value witness if it is wholly or in substantial part based on improper elements, held that it is not proper to strike part of an answer, thus changing the witness' testimony to something other than what the witness intended. 238 Or at 453-57.

In *Junc. City Water Control v. Patterson*, 8 Or App 107, 493 P2d 76 (1972), we held that it was proper for the owner to testify to the highest and best use of the property before and after the taking. The plaintiff also objected to the owner's reliance on allegedly speculative future plans for the property in arriving at his estimate of the property's value. We held on the merits that the evidence was not too speculative. 8 Or App at 112-13.

■ These cases indicate that the rule allowing an owner to testify as to value with no qualification other than being an owner does not permit the owner to rely on impermissible criteria as the basis for that testimony. We have held in this case that the trial court did not err when it determined that evidence of income that defendant might receive from a hypothetical development of the property was excessively speculative. As a result, Smith had no greater ability to base his estimate of value on the income approach than did any other witness. The trial court properly excluded that evidence.

■ Finally, defendant argues that the trial court erred in not allowing it to ask Smith on redirect about the income approach. Defendant based that request on plaintiff's cross-examination of Smith, in which plaintiff brought out that Smith had previously testified under oath that the value of the property was $3.62 a foot and that he had used the income method in doing so.[6] Plaintiff then pointed out that Smith had reached an almost identical figure by using the comparable sales approach. The purpose of the questioning was to impeach Smith by suggesting that he had a fixed idea of what he wanted for the land and would adjust his figures

---

[6] The previous testimony to which plaintiff referred came in the offer of proof.

to reach it. The trial court indicated that plaintiff had come close to opening the door and that it would permit questioning about the income approach if plaintiff went any further. Plaintiff did not go further, and the court refused either to allow defendant to bring out Smith's opinion based on the income approach or to argue the income approach in its closing.

The trial court acted within its discretion in these respects. Plaintiff did not go into the details of the income approach in its cross-examination, and its questions did not make that approach any less speculative. The jury already knew that Smith placed a higher value on the property than did any other witness, based on an approach that the court permitted and that the parties' appraisers had already discussed in considerable detail. Given the broad scope allowed a party on cross-examination, plaintiff's questioning did not require the court to allow defendant to open a new substantive subject in response to plaintiff's impeachment of Smith.

Affirmed.